MARC E. ELIAS, ESQ. (D.C. Bar No. 442007)*
JOHN M. DEVANEY (D.C. Bar No. 375465)*
**PERKINS COIE LLP**
700 Thirteenth St. NW, Suite 800
Washington, D.C. 20005-3960
Tel: (202) 654-6200
melias@perkinscoie.com
jdevaney@perkinscoie.com

ABHA KHANNA, ESQ. (Wash. Bar No. 42612)*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Tel: (206) 359-8000
akhanna@perkinscoie.com

BRADLEY SCHRAGER, ESQ. (SBN 10217)
DANIEL BRAVO, ESQ. (SBN 13078)
**WOLF, RIFKIN, SHAPIRO,
SCHULMAN & RABKIN, LLP**
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120
Tel: (702) 341-5200
bschrager@wrslawyers.com
dbravo@wrslawyers.com

*Attorneys for Intervenor-Defendants Nevada State Democratic Party and Democratic National Committee*

*Pro hac vice to be submitted

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

| | |
|---|---|
| JILL STOKKE, an individual, CHRIS PRUDHOME, an individual, MARCHANT FOR CONGRESS, RODIMER FOR CONGRESS,<br><br>Plaintiffs,<br><br>vs.<br><br>SECRETARY OF STATE BARBARA CEGAVSKE, in her official capacity, and CLARK COUNTY REGISTRAR OF VOTERS JOSEPH P. GLORIA, in his official capacity,<br><br>Defendants, | Case No.: 2:20-cv-02046-APG-DJA<br><br>**PROPOSED INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

and

NEVADA STATE DEMOCRATIC PARTY and DEMOCRATIC NATIONAL COMMITTEE,

        Proposed Intervenor-Defendants.

This lawsuit is nothing more than a desperate attempt by Plaintiffs' counsel to make an end-run around the loss they suffered in Nevada state court just a few days ago on nearly identical claims. Though the Plaintiffs here might be new, their causes of action are a nearly identical to the petition for mandamus in *Kraus v. Cegavske*, No. 20 OC 00142 1B (Nev. Dist. Ct. Oct. 23, 2020) (attached as Ex. 1). In *Kraus*, Judge James E. Wilson, Jr. of the First Judicial District in Carson City found that Clark County's use of the Agilis machine to sort and process the historic number of mail ballots Clark County received was not only permissible, but the *only way* the County would be able to process all ballots before the statewide canvass deadline on November 15. *See Kraus v. Cegavske*, No. 20 OC 00142 1B, slip op. at 4 (Nev. Dist. Ct. Nov. 2, 2020) (attached as Ex. 2). Additionally, Judge Wilson held—after hearing testimony from seven poll observers affiliated with President Trump's reelection campaign—that Plaintiffs' counsel had "failed to prove Registrar Gloria has interfered with any right they or anyone else has as an observer." *Id.* at 11. Their claims here—supported by just two boilerplate declarations—fare no better. For a variety of jurisdictional reasons, this Court should dismiss the lawsuit before even reaching the merits. And at any rate, Plaintiffs' claims both fail as a matter of law and are wholly unsupported by compelling evidence. The law, facts, and equities all militate against the relief Plaintiffs seek, and their motion for a temporary restraining order or preliminary injunction should be denied.

**BACKGROUND**

In a special session this past summer, the Nevada Legislature enacted Assembly Bill 4

2

("AB 4"), creating a category of "affected elections" during emergency periods for which the State would mail ballots to voters, just as it did for the June 2020 primary. Those rules apply to this election.

Plaintiffs' complaint and motion touch on two areas of AB 4 and Nevada's other election laws: the processing and counting of mail ballots and the public's right to observe that processing and counting.

I.  **Mail Ballots**

When a ballot is received by the county clerk, the counting board is required to check the signature on the ballot return envelope against the signature in the registration records. NRS 293.8874(1)(a) ("The clerk or employee shall check the signature used for the mail ballot against all signatures of the voter available in the records of the clerk."). The statute does not require that a manual or electronic process be used, specifying only that a ballot cannot be flagged for rejection unless "at least two employees in the office of the clerk believe there is a reasonable question of fact as to whether the signature used for the mail ballot matches the signature of the voter." NRS 293.8874(1)(b). AB 4 specifically allows the clerk to "establish procedures for the processing and counting of mail ballots." NRS 293.8871(1). Those procedures "[m]ay authorize mail ballots to be processed and counted by electronic means." NRS 293.8871(2)(a).

Once a ballot is accepted by the county clerk's office, it is securely transferred to the counting board. NRS 293.8874(3). The counting board then verifies the name on the return envelope and the serial numbers on the return envelope and ballot. NRS 293.8884(2). After this is completed, the ballot "must be counted." *Id*.

Clark County is required to complete this process by November 12, 2020. *See* NRS 293.8881(1). Because Nevada allows ballots to be counted if they are postmarked on election day and received by November 10, *see* NRS 293.317(b)(2), and also allows voters to cure an issue with the signature on their ballots until November 12, *see* NRS 293.8874(4), Clark County will be receiving ballots that it has to process and count throughout this period. This deadline is followed in short succession by a number of interconnected deadlines that move the State

1 towards a final resolution of the election. The county is required to complete its canvass by
2 November 16. *See* NRS 293.387(1). This deadline triggers the window for recounts, which must
3 be requested by November 19, *see* NRS 293.403(1), and must conclude by November 29, *see*
4 NRS 293.405(3). On November 24, the Nevada Supreme Court canvasses the vote. *See* NRS
5 293.395(2). And the State's election results must be certified by December 1, 2020. *See* NRS
6 293.395.

## II.   Public Access to Handling, Processing, and Counting of Ballots

The election laws provide very specific details about when and how the public must be allowed to observe this counting process. For mail ballots, AB 4 states that once the counting board begins counting ballots, "[t]he counting procedure must be public." NRS 293.8881(1). Neither AB 4 nor any other part of the Nevada Revised Statutes grants the public additional rights to observe or access the processing of mail ballots by the county clerk.

For in-person voting, on the other hand, Nevada's laws and regulations create a number of qualified rights for members of the public to observe the process. For example, members of the general public may observe voting at polling places from a designated area in the polling location that "allow[s] for meaningful observation." NAC 293.245(6). Members of the public may also "observe the handling of the ballots" after the close of polls at polling locations so long as the "do not interfere." NRS 293B.330(4). Candidate representatives and members of the press are permitted to observe the testing of voting machines used at polling places. NRS 293B.330(2). And the code lays out a litany of other opportunities for members of the public to observe the handling and processing of ballots from polling places. *E.g.*, NRS 293B.335(3) (members of the public can observe delivery of ballots from polling places); NRS 293B.380(2)(a) (the ballot processing board must allow public observation).

## LEGAL STANDARD

"Injunctive relief, whether temporary or permanent, is an 'extraordinary remedy, never awarded as of right.'" *Welch v. Weise*, No. 2:19-cv-01243-APG-NJK, 2020 WL 3621246, at *1 (D. Nev. July 2, 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008)). "The

analysis for a temporary restraining order is 'substantially identical' to that of a preliminary injunction," and requires the movant to "establish four elements: '(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that the public interest favors an injunction.'" *Rodriguez v. NaphCare, Inc.*, No. 2:17-cv-02344-RFB-DJA, 2020 WL 2748307, at *2 (D. Nev. May 27, 2020) (first quoting *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001); and then quoting *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014)). Injunctive relief can be denied if a plaintiff fails to state a claim on which relief can be granted, *see Villagrana v. Recontrust Co., N.A.*, No. 3:11-cv-00652-ECR-WGC, 2012 WL 1890236, at *7 (D. Nev. May 22, 2012), or establish standing. *See Vazquez v. Bank of Am. Home Loans*, No. 2:10-CV-00116-PMP-RJJ, 2010 WL 3385347, at *1 (D. Nev. Aug. 23, 2010).

## ARGUMENT

**I.     This lawsuit is improper.**

As a threshold matter, this action is fundamentally improper. Plaintiffs' counsel in this case brought a lawsuit involving nearly identical claims in Nevada state court and failed to prevail on a single count at the district court level. *See* Exs. 1–2. They then appealed to the Nevada Supreme Court on the same day and asked for a stay, which was unanimously denied by all seven justices within a matter of hours. *See* Ex. 3. That case is still pending. In fact, Plaintiffs' counsel yesterday requested, and was granted, a one-week extension to their proposed emergency briefing schedule. *See* Ex. 4. The instant case involves interpretation and application of Nevada's vote counting and observation laws. When state law "appears to furnish easy and ample means for determining" a case's resolution, a federal court should "stay its hand" until resolution of such claims in parallel state court proceedings. *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 501 (1941). This Court should therefore abstain from deciding Plaintiffs' claims until the Nevada Supreme Court has had its opportunity to rule, just as Plaintiffs' counsel here requested it to do only a few days ago.

**II.     Plaintiffs cannot succeed on the merits of their claims.**

Plaintiffs' claims are premised on a misunderstanding of the law and a mischaracterization of the facts. They cannot succeed on the merits of their claims.

**A.     Plaintiffs lack standing.**

Plaintiffs bear the burden of establishing federal subject matter jurisdiction by a preponderance of the evidence. *See United States ex rel. Solis v. Millennium Pharms., Inc.*, 885 F.3d 623, 625 (9th Cir. 2018). "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Even at the pleading stage, the plaintiff must "clearly . . . allege facts demonstrating" each element. *Id.* (alteration in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

Plaintiffs lack standing to assert their equal protection challenge that "voters in Clark County, including Plaintiff Stokke, are at unequal risk of having their legal votes diluted by votes with mismatch signatures." Compl. ¶ 27. As numerous courts have held, vote dilution by fraud does not suffice as an injury for standing purposes both because it does not entail any differential treatment—every voters' vote is weighted and counted the same—and because claims of voter fraud are entirely speculative. *See, e.g.*, *Donald J. Trump for President, Inc. v. Way*, Civil Action No. 20-10753 (MAS) (ZNQ), 2020 WL 6204477, at *6 (D.N.J. Oct. 22, 2020); *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680, at *59 (W.D. Pa. Oct. 10, 2020); *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445 JCM (VCF), 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020); *Martel v. Condos*, No. 5:20-cv-131, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926–27 (D. Nev. 2020); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015).

Plaintiffs also lack standing to bring their claim under the Elections Clause. Plaintiffs

assert that Defendants have usurped the Nevada Legislature's constitutional authority to set the manner of elections by using the Agilis machine, in violation of the Elections Clause of the U.S. Constitution. Compl. ¶¶ 19–23. Plaintiffs, however, have no authority or standing to assert the rights of the Nevada Legislature. *See, e.g.*, *Corman v. Torres*, 287 F. Supp. 3d 558, 567–73 (M.D. Pa. 2018) (per curiam). And the U.S. Supreme Court has squarely held that a private citizen does not have standing to bring generalized challenges under the Elections Clause. *See Lance v. Coffman*, 549 U.S. 437, 442 (2007) (holding that four Colorado voters lacked standing where "[t]he only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed" because "[t]his injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past").

Plaintiffs' standing deficiencies are not remedied by tacking on two candidate committees as parties. Nowhere in their pleadings do Plaintiffs actually assert that these candidate committees are injured by any alleged violations of Nevada or federal law.

In short, Plaintiffs have failed to establish standing by "clearly . . . alleg[ing] facts demonstrating" each element. *Spokeo*, 136 S. Ct. at 1547 (first alteration in original) (quoting *Warth*, 422 U.S. at 518). Plaintiffs' Elections Clause and equal protection claims should be dismissed for this reason alone.

**B.  Clark County's use of the Agilis machine is lawful.**

Even if Plaintiffs had standing to bring their claims, they cannot prevail on the merits of their challenges to Clark County's use of the Agilis sorting machine, which is consistent with both state and federal law. Given the vast size of Clark County's voting population and the record number of mail ballots that needed to be tabulated, Registrar Gloria has opted to employ the Agilis sorting machine to increase the efficiency with which mail ballots are processed. In their complaint and motion, Plaintiffs claim that the use of the Agilis machine is impermissible under the Nevada election code, and therefore violates the Elections Clause of the U.S. Constitution, *see* Compl. ¶¶ 19–23; Mot. 6–7, and that Clark County's use of the machine constitutes an equal protection violation, *see* Compl. ¶¶ 24–28; Mot. 6–7. Both claims fail as a

matter of law: use of the Agilis machine is explicitly contemplated by, and therefore wholly consistent with, Nevada law, and Plaintiffs have failed to even plead a viable equal protection claim, let alone demonstrate a likelihood of success on the merits.

At the outset, Plaintiffs' claims challenging use of the Agilis machine are barred by the equitable doctrine of laches. *See, e.g.*, *Sierra Club v. U.S. Dep't of Transp.*, 245 F. Supp. 2d 1109, 1114–15 (D. Nev. 2003) (noting that "[d]eclaratory and injunctive relief are equitable remedies and may thus be barred by laches," for which "a court must consider two criteria: the diligence of the party against whom the defense is asserted and the prejudice to the party asserting the defense" (citing *Apache Survival Coal. v. United States*, 21 F.3d 895, 905 (9th Cir. 1994))). Clark County began using the Agilis machine to conduct signature matching during the State's June primary. Yet Plaintiffs waited until November 5—*two days after election day*—to seek "emergency" relief that would fundamentally disrupt the manner in which Clark County processes ballots, threatening to delay election results in Nevada's largest county for weeks. Plaintiffs could have and *should have* brought these claims at an earlier juncture, particularly considering that their counterparts on the presidential tickets brought similar challenges to AB 4 in federal court more than three months ago. *See Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445 JCM (VCF) (D. Nev.). Plaintiffs' inexplicable delay has prejudiced the parties to this action—including Clark County, which has been planning for this election for months and implementing its plan for almost three weeks, and Proposed Intervenor-Defendants, who must now expend time and resources safeguarding the votes of its members and for its candidates.

          **1.**    **Use of the Agilis machines does not violate the Elections Clause.**

Even if Plaintiffs' claims were not lodged at a prejudicially delayed hour, Clark County's use of the Agilis machine is consistent with Nevada law. In passing AB 4, the Nevada Legislature specifically authorized counties to adopt procedures that include the processing and counting of mail ballots "*by electronic means*." NRS 293.8871(2)(a) (emphasis added). Pursuant to this authority, Registrar Gloria employs the Agilis machine to sort ballots and conduct a first

pass in matching the signature on each ballot-return envelope with the signature on file in Clark County's records.

Plaintiffs maintain that this nonetheless violates Nevada law because the initial signature match is not done by a person. *See, e.g.* Mot. 6 ("The use of the Agilis Ballot Packing Sorting System to check signatures of ballots clearly violates Nevada law, enacted by the legislature, which states '*the clerk or an employee in the office of the clerk* shall check the signature used for the mail ballot.'" (quoting NRS 293.8874(1))). But *nothing* in NRS 293.8874 requires the clerk or the clerk's employees to conduct its initial signature matching manually, or to abstain from using a machine to process ballots. To the contrary, NRS 293.8871(2)(a) *explicitly permits* use of electronic means to process ballots. Human intervention is only required when a ballot is to be rejected. At that point, "at least two employees in the office of the clerk" must agree that "there is a reasonable question of fact as to whether the signature used for the mail ballot matches the signature of the voter." NRS 293.8874(1)(b). Plaintiffs have not alleged—nor could they—that Clark County has used the Agilis machine to *reject*, as opposed to approve, mail ballots. Therefore, the use of the Agilis machine for the limited purpose for which Clark County uses it is wholly consistent with the election scheme enacted by the Nevada Legislature—and, therefore, with the Elections Clause.

### 2. Use of the Agilis machine does not violate the Equal Protection Clause.

Plaintiffs' equal protection claim fares no better. They suggest that the Equal Protection Clause is violated by Clark County's use of the Agilis machine because "[n]o other county in Nevada uses this system, and accordingly, voters in Clark County, including Plaintiff Stokke, are at an unequal risk of having their legal votes diluted by votes with mismatched signatures." Compl. ¶ 27. This claim fails on multiple grounds.

*First*, even accepting that their legal theories are viable—as discussed below, they are not—Plaintiffs failed to adduce even a *shred* of compelling proof to support their equal protection claim. Although their complaint makes allegations of "[i]rregularities" in Clark

9

County's administration of this election—"including lax procedures for authenticating mail ballots and over 3,000 instances of ineligible individuals casting ballots," Compl. ¶ 11—they have completely failed to substantiate these accusations in their motion for immediate relief. Their equal protection claim in particular suffers from lack of evidence. This claim is predicated on the assumption that Clark County's use of the Agilis machines leads to compromised results, and they allege that "use of Agilis signature-verification software [] allowed Plaintiff Stokke's ballot, which she had not signed, to be accepted and counted in the Election," and that Clark County "is using the Agilis signature-verification software in a manner which is contrary to the manufacturer's prescriptions." *Id.* ¶¶ 13–14. But again, Plaintiffs *have no proof* to support these allegations; the *only* evidence they have even submitted is Ms. Stokke's declaration, which does not support the assertion that the Agilis machine is responsible for any difficulties she might have experienced. There is, ultimately, no evidence in the record that Clark County's use of the Agilis machine disadvantages any voters or imposes *any* burden on Nevadans' franchise. Plaintiffs therefore cannot succeed on the merits of this claim.

*Second*, even if Plaintiffs had provided evidence to support their case, their equal protection claim fails as a matter of law. The implication of Plaintiffs' equal protection claim is that Clark County voters will have the value of their votes diluted by *unlawful* ballots—those with "mismatched signatures." But vote dilution is a viable basis for equal protection claims only in certain contexts, such as when laws are crafted that structurally devalue one community's votes over another's. *See, e.g.*, *Republican Party of Pa. v. Cortés*, 218 F. Supp. 3d 396, 406–07 (E. D. Penn. 2016); *see also Reynolds v. Sims*, 377 U.S. 533, 568 (1964) ("Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State."). In these unique cases, plaintiffs allege that their votes are devalued as compared to similarly situated voters in other parts of the state. *See Reynolds*, 377 U.S. at 567–68. Here, by contrast, Plaintiffs allege that Clark County voters will experience dilution caused by the alleged casting of unlawful ballots. But "[t]he Constitution is not an election fraud statute." *Minn. Voters*

*All. v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013) (quoting *Bodine v. Elkhart Cnty. Election Bd.*, 788 F.2d 1270, 1271 (7th Cir. 1986)). Plaintiffs' theory of vote-dilution-by-fraud is fundamentally speculative and applies to all voters equally, making it an ill-fit for an equal protection challenge that requires disparate treatment—thus explaining why courts across the country have repeatedly rejected it both on standing and merits grounds. *See supra* Part II.A; *see also, e.g.*, *Boockvar*, 2020 WL 5997680, at *76; *Donald J. Trump for President, Inc. v. Bullock*, No. CV 20-66-H-DLC, 2020 WL 5810556, at *12 (D. Mont. Sept. 30, 2020); *Cortés*, 218 F. Supp. 3d at 406–07.

*Third*, even if NRS 293.8871—which permits counties to adopt their own "procedures for the processing and counting of mail ballots"—and Clark County's consequent use of the Agilis machine constituted disparate treatment, it is simply untrue, as Plaintiffs allege, that "[t]here is no legitimate state interest that justifies this disparity" and that this disparity "violates Nevada voters' right to have uniform, statewide standard of counting and recounting all votes accurately." Compl. ¶ 28. To the contrary, the statute furthers a legitimate government purpose and therefore passes constitutional muster. "County of residence is not a suspect classification warranting heightened scrutiny," *Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018), and because Plaintiffs have provided *no proof* that Clark County accepts unlawful ballots, or rejects lawful ballots, at a higher rate than Nevada's other counties, rational-basis review applies. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Nevada is made up of 16 counties and one independent city that vary dramatically by population, size, and geographic attributes. Like many other states, Nevada has acknowledged these differences by adopting a decentralized system of election administration that empowers county clerks to make decisions about what their county needs. NRS 293.8871(1) is part of this decentralized system: the statute facilitates "incremental election-system experimentation," *Short*, 893 F.3d at 679, and acknowledges the differing demands on county election officials in Clark County—1,402,235 registered voters—and Esmerelda County—607 registered voters. These interests alone justify any purported differential treatment.

Ultimately, equal protection does not demand the imposition of "mechanical compartments of law all exactly alike," *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31 (1922), and "few (if any) electoral systems could survive constitutional scrutiny if the use of different voting mechanisms by counties offended the Equal Protection Clause." *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680, at *45 (W.D. Pa. Oct. 10, 2020) (quoting *Donald J. Trump for President, Inc. v. Bullock*, No. CV 20-66-H-DLC, 2020 WL 5810556, at *14 (D. Mont. Sept. 30, 2020)). Clark County, the most populous in Nevada, has an interest in processing ballots in a different manner than other counties to ensure it is able to handle the large numbers it receives. *See Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301, at *9 (D. Nev. May 27, 2020) ("[I]t cannot be contested that Clark County, which contains most of Nevada's population—and likewise voters (69% of all registered voters)—is differently situated than other counties."). Its decision to do so using the Agilis machine, which neither infringes the right to vote nor targets any suspect classifications, is entirely rational and consistent with the basic tenets of equal protection.

### C.   Clark County has made its vote tabulation public.

Finally, Plaintiffs allege that Clark County has violated Nevada laws requiring public access to vote tabulation. *See* Compl. ¶¶ 29–30; Mot. 6. They seek injunctive relief requiring Defendants "to allow meaningful access to the ballot counting process." Mot. 8. But Plaintiffs have failed to adduce any proof that Clark County violated any aspect of Nevada law relating to public observation. The Nevada election code states that "the counting procedure" employed by the counting board "must be public." NRS 293.363(1); NRS 293.8881(1). *That's it*. That is all that Clark County is required to do by Nevada law. And Plaintiffs have provided *no evidence* that Clark County has not made this process public. To the contrary, Mr. Prudhome's declaration actually indicates that the tabulation has been made public, since he was allowed to "remain[] in the observer area as an observer." Prudhome Decl. ¶ 6.

Ultimately, Plaintiffs' dispute is that they have not been given the degree of access to the tabulation process that they would prefer. But *nothing* in Nevada law mandates any greater

12

degree of public observation than what Clark County has already provided. Courts have repeatedly concluded that there is no individual right to observe vote tabulation.[1] Indeed, as the Nevada state court already found when the Trump Campaign attempted to similarly "unlimited access to . . . ballot counting," there is no "constitutional provision, statute, rule, or case that supports such a request." *Kraus*, slip op. at 10–11.[2] Plaintiffs cannot rewrite the State's election laws to impose any greater obligation on Defendants than what the Nevada Legislature has prescribed. And because Clark County has complied with the State's election code by making their tabulation public, neither Nevada law nor any other law has been violated. Plaintiffs cannot succeed on the merits of this claim.

### III. Equitable considerations militate against Plaintiffs' requested relief.

The remaining equitable factors weigh strongly against granting the relief Plaintiffs seek.

Plaintiffs assert that they "will suffer irreparable injury in the absence of immediate relief." Mot. 6. But the only injury they identify is the alleged "infringement of fundamental constitutional freedoms such as the right to vote." *Id*. This is simply a repackaging of their merits arguments, which fail on the law and the facts. Given these shortcomings, Plaintiffs have fallen far short of "establish[ing] that irreparable harm is *likely*," let alone even possible. *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Moreover, as described above, Petitioners also sat on their claims for far too long to raise them only *after* the Election and *after* failing to achieve their requested relief in the Nevada state courts. Plaintiffs in this case have known of Clark County's use of the Agilis machine since just after the June primary. That they

---

[1] *See, e.g.*, *Boockvar*, 2020 WL 5997680, at *67 ("[T]here is no individual constitutional right to serve as a poll watcher." (quoting *Pa. Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 WL 5554644, at *30 (Pa. Sept. 17, 2020))); *Cortés*, 218 F. Supp. 3d at 413–14 ("[C]ourts have found that 'poll watching is not incidental to' the right of free association and it therefore 'has no distinct First Amendment protection.'" (quoting *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007))).

[2] The *Kraus* court further found, after conducting a thorough evidentiary hearing, that the petitioners in that case "failed to prove Registrar Gloria has interfered with any right they or anyone else has an observer." Slip op. at 11.

waited months to bring these claims is further evidence that the extraordinary remedy of preliminary relief is not warranted. *See GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984) ("By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action." (quoting *Gillette Co. v. Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959))).

Plaintiffs incorrectly assert that the final three factors weigh in their favor and that "absence of injunctive relief outweighs any alleged harm the defendant will suffer if the injunction is granted." Mot. 7. This could not be further from the truth. Clark County must process almost *75 percent* of the deluge of mail ballots received statewide during this election cycle, and it must do so prior to the state's canvassing deadline on November 16. Plaintiffs are asking for relief that would require Clark County to dramatically alter its carefully designed protocols three days after Election Day and more than two weeks after it first began processing ballots. In his opinion in the nearly identical state court case, Judge Wilson found that "if Clark County is not allowed to continue using Agilis the county will not meet the canvass deadline." *Kraus*, slip op. at 4. This will have enormous downstream effects for the County, the State, and all Nevada voters. The public interest would certainly not be served by such an unnecessary delay.

Finally, it should not be lost on this Court that Plaintiffs ask for emergency relief for just one of Nevada's 17 counties, the state's largest Democratic stronghold. There is no reason to upset ballots processing at this late hour anywhere in the state, but to do so under such politically suspect motives makes the request relief all the more unwarranted.

///
///
///
///
///
///
///

## CONCLUSION

For these reasons, Proposed Intervenors respectfully request that this Court deny Plaintiffs' emergency motion for temporary restraining order and preliminary injunction.

DATED this 6th day of November, 2020.

        **WOLF, RIFKIN, SHAPIRO,**
        **SCHULMAN & RABKIN, LLP**

        By:  */s/ Bradley S. Schrager*
              Bradley S. Schrager, Esq., SBN 10217
              Daniel Bravo, Esq., SBN 13078
              3556 E. Russell Road, Second Floor
              Las Vegas, Nevada 89120

              Marc E. Elias, Esq.*
              John M. Devaney, Esq.*
              **PERKINS COIE LLP**
              700 Thirteenth St. NW, Suite 800
              Washington, D.C. 20005-3960

              Abha Khanna, Esq.*
              **PERKINS COIE LLP**
              1201 Third Avenue, Suite 4900
              Seattle, Washington 98101-3099

              *Attorneys for Proposed Intervenor-Defendants*
              *Nevada State Democratic Party and Democratic*
              *National Committee*

              *Pro hac vice to be submitted

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of November, 2020 a true and correct copy of **PROPOSED INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** was served via the United States District Court's CM/ECF system on all parties or persons requiring notice.

By: */s/ Dannielle Fresquez*
Dannielle Fresquez, an Employee of
WOLF, RIFKIN, SHAPIRO, SCHULMAN &
RABKIN, LLP