———2:20-cv-2046-APG-DJA - November 6, 2020———

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEVADA

3

4    JILL STOKKE; CHRIS            )
     PRUDHOME; MERCHANT for        )  Case No. 2:20-cv-2046-APG-DJA
5    CONGRESS; and RODIMER for     )
     CONGRESS,                     )  Las Vegas, Nevada
6                                  )  Friday, November 6, 2020
             Plaintiffs,           )  2:08 p.m.
7                                  )
         vs.                       )  EMERGENCY MOTION FOR
8                                  )  PRELIMINARY INJUNCTION VIA
     BARBARA K. CEGAVSKE,          )  VIDEOCONFERENCE
9    Secretary of State, in her    )
     official capacity;            )
10   JOSEPH P. GLORIA, Clark       )
     County Registrar of          )
11   Voters, in his official       )
     capacity, et al.,             )
12                                 )
             Defendants.           )
13   _____)  C E R T I F I E D   C O P Y

14

15

16           REPORTER'S TRANSCRIPT OF PROCEEDINGS

17          BEFORE THE HONORABLE ANDREW P. GORDON,
                 UNITED STATES DISTRICT JUDGE

18

19   APPEARANCES:

20   (Appearances on Page 2)

21   COURT REPORTER:

22       Heather K. Newman, RPR, CRR, CCR #774
         United States District Court
23       333 Las Vegas Boulevard South, Room 1334
         Las Vegas, Nevada 89101
24       (702) 471-0002 or HN@nvd.uscourts.gov

25   Proceedings reported by machine shorthand; transcript produced
     by computer-aided transcription.

─────2:20-cv-2046-APG-DJA - November 6, 2020─────

 1   APPEARANCES:

 2   For the Plaintiffs:

 3        THE O'MARA LAW FIRM, P.C.
          BY:  DAVID C. O'MARA, ESQ.
 4        311 East Liberty Street
          Reno, NV 89501
 5        (775) 323-1321

 6   For the Defendant Barbara K. Cegavske:

 7        OFFICE OF THE ATTORNEY GENERAL
          BY:  CRAIG A. NEWBY, ESQ.
 8            GREGORY LOUIS ZUNINO, ESQ.
          100 North Carson Street
 9        Carson City, NV 89701
          (775) 684-1206
10
     For the Defendant Joseph P. Gloria:
11
          CLARK COUNTY DISTRICT ATTORNEY'S OFFICE, CIVIL DIVISION
12        BY:  MARY-ANNE M. MILLER, ADA
          500 South Grand Central Parkway, 5th Floor
13        P.O. Box 552215
          Las Vegas, NV 89155
14        (702) 455-4761

15   For the Intervenor Defendants Democratic National Committee and
     Nevada State Democratic Party:
16
          WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
17        BY:  DANIEL BRAVO, ESQ.
              BRADLEY SCOTT SCHRAGER, ESQ.
18        3556 East Russell Road
          Las Vegas, NV 89120
19        (702) 341-5200

20        PERKINS COIE LLP
          BY:  JOHN M. DEVANEY, ESQ.
21        700 Thirteenth Street NW, Suite 600
          Washington, DC 20005
22

23   Also present:

24        Barbara Cegavske, Secretary of State
          Aaron Ford, Attorney General
25        Wayne Thorley, Deputy Secretary of State for Elections

—2:20-cv-2046-APG-DJA - November 6, 2020—

1          LAS, NEVADA; FRIDAY, NOVEMBER 6, 2020; 2:08 P.M.

2                              --oOo--

3                    P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  Jill Stokke, et al. vs.

5   Barbara K. Cegavske, et al., 2:20-cv-2046-APG-DJA.

6          Counsel, will you please make your appearances,

7   starting with the plaintiff?

8          MR. O'MARA:  Yes, good afternoon, Your Honor,

9   David O'Mara on behalf of plaintiff.

10         THE COURT:  Good afternoon.

11         Anyone else for the plaintiff?

12         MR. O'MARA:  Just me --

13         THE COURT:  I'm sorry, just Mr. O'Mara?

14         MR. O'MARA:  That's correct.

15         THE COURT:  Thank you.

16         Anyone for the -- who's on for the defendants?

17         MR. NEWBY:  Good afternoon, Your Honor, Craig Newby,

18  Deputy Solicitor General for the State of Nevada, representing

19  Secretary of State Barbara Cegavske.  Also, present virtually,

20  per me looking at the Zoom, is Attorney General Ford and

21  Mr. Craig Zunino from my office.  Also present for the client

22  is Deputy Secretary of State for Elections, Wayne Thorley.

23         MS. CEGAVSKE:  And this is Barbara Cegavske, Secretary

24  of State, I'm also on the line.

25         THE COURT:  Thank you, Secretary of State Cegavske.

———2:20-cv-2046-APG-DJA - November 6, 2020———

1          All right.  I'm going to have all the cameras turned

2     off.

3          MR. BRAVO:  Your Honor, good afternoon, this is

4     Daniel Bravo, from the law firm of Wolf Rifkin on behalf of

5     proposed intervenor the Democratic National Committee and the

6     Nevada State Democratic Party.  Along with me virtually is my

7     colleague, Brad Schrager, from the law firm of Wolf Rifkin as

8     well as Mr. John Devaney from the law firm of Perkins Coie, who

9     we submitted a verified petition for pro hac vice.

10          THE COURT:  Thank you -- thank you, Mr. Bravo.  I

11     forgot to mention that as well, that we've allowed you to

12     participate.

13          All right.  So I'm going to --

14          MS. MILLER:  Your Honor, this is Mary-Anne Miller from

15     the Clark County District Attorney's Office on behalf of

16     defendant Joseph Gloria.

17          THE COURT:  Thank you, Ms. Miller.  I appreciate you

18     making your appearance.  I apologize for leaving you out of

19     that.  I guess -- is there anybody else that I've missed, any

20     of the lawyers or parties on the line that I need to be aware

21     of?

22          Going once. . . going twice. . .  All right.  Thank

23     you all.

24          Like I said, I'm going to have the video shut down.

25     We're just going to do this by audio.

———2:20-cv-2046-APG-DJA - November 6, 2020———

```
1              Let me note first for the record that Federal Rule of
2    Civil Procedure Number 1 counsels courts to secure the just,
3    speedy and inexpensive determination of every action and
4    proceeding.  Due to the COVID-19 pandemic and consistent with
5    Rule 1 and with this Court's General Orders, this emergency
6    hearing is being conducted telephonically by audio only.
7    Information on how to access this public hearing has been
8    prominently posted on the court's website to allow full access
9    to this hearing by the public, the media, and the participants,
10   and we also issued a Minute Order with the dial-in information
11   so folks could join on the phone if they wanted to hear.
12             To ensure that the parties have a full and fair day
13   here in court, all attendees to this telephonic hearing will be
14   muted and only I and counsel who are arguing will have their
15   microphones activated.  That should cut down on the background
16   noise and interference and hopefully allow the parties to focus
17   in on the arguments.
18             Let me put everyone on notice that recording -- and
19   this includes the folks on the phone as well -- recording,
20   taping, streaming, or otherwise broadcasting district court
21   hearings is expressly prohibited by this court's General Order
22   2017-02 and the policies of the judicial conference.  So,
23   recording, taping, streaming or otherwise broadcasting the
24   audio, or any photograph or video of this hearing, is
25   prohibited.  If you're doing so, stop.
```

—————2:20-cv-2046-APG-DJA - November 6, 2020—————

1          Let me next offer a personal word of thanks to the

2     many judicial clerks in my chambers and some of my fellow

3     judge's chambers who have helped me get up to speed really

4     quickly on this case given that it was filed late yesterday

5     afternoon and the motion was filed last night.  We had

6     contributions from many of our court staff, chambers staff, and

7     a special thanks to our court administrative staff and

8     courtroom deputy for helping me put together the technology to

9     allow us to do this hearing this afternoon.  We're all keeping

10    our fingers crossed that the technology works and we're able to

11    continue with this hearing.

12          I'm first going to address the Motion to Intervene

13    that was filed by I'm just going to call it the DNC and the

14    Nevada Democratic National Party.  Let me ask Mr. O'Mara, does

15    your client -- clients, plural -- oppose the Motion to

16    Intervene?

17          MR. O'MARA:  No, Your Honor, neither do we oppose the

18    pro hac vice application.

19          THE COURT:  All right.  Mr. Newby, if you're going to

20    argue, or is Mr. Zunino for the defense, do you have any

21    objection to the DNC intervention?

22          MR. BRAVO:  Your Honor, Craig Newby will be doing the

23    argument today.  We have no objection to either --

24       (Court reporter clarification).

25          THE COURT:  Thank you.

1          That was my court reporter Heather Newman who's --

2     like she said, we don't have the audio -- the video, so please

3     identify yourselves before speaking.

4          I think that was Mr. Newby speaking.

5          MR. NEWBY:  It was, Your Honor, Craig Newby, again,

6     for defendant Cegavske.  I will be doing the argument this

7     afternoon on the merits.  Secretary has no objection to the

8     Motion to Intervene or the Motion for pro hac vice admission.

9          THE COURT:  Ms. Miller, on behalf of Mr. Gloria, do

10    you have any objection to the Motion to Intervene?

11         MS. MILLER:  No, Your Honor.

12         THE COURT:  All right.  I will grant the Motion to

13    Intervene.  I'll do a separate order on the pro hac vice

14    application.  I haven't reviewed it yet, so I just want to make

15    sure it's all satisfied -- complies with our local rules.

16    Presuming it does, I will conditionally allow it for at least

17    purposes of the argument today.

18         So, we now turn to the motion for Temporary

19    Restraining Order and Motion for Preliminary Injunction.

20    Before we dig into it, let me again remind everyone that my

21    court reporter is listening in on audio like everyone else.

22    Please state your name before speaking so that we get it

23    accurate in the record.  Please don't speak over each other.

24    Pause to make sure the speaker is finished before jumping in

25    because sometimes the audio cuts out if everyone's speaking at

2:20-cv-2046-APG-DJA - November 6, 2020

1   once.

2          I have read the papers that were filed, the complaint,

3   the motion for TRO, obviously, the motion for expedited hearing

4   which I granted, received the numerous -- I shouldn't say

5   numerous, but the responses that were filed by the

6   defendants -- I should say at least defendant Cegavske.  I have

7   reviewed the proposed intervention by the DNC.  So, I think I'm

8   pretty up to speed, factually, and on the arguments.  I have

9   some specific questions to ask each of you as we go forward,

10  but I will allow you to start with an argument if you want to

11  make it.  Just please don't repeat everything in your papers

12  because we don't want to be here all night, and I have read

13  those.

14         So, Mr. O'Mara, it's your motion, you get to go first.

15         MR. O'MARA:  Thank you, Your Honor.  And I echo your

16  comments in regards to the court staff and, also, I also want

17  to acknowledge counsel for all this -- all the parties who

18  continue to work very well together to make sure that when

19  something is filed, they get it to the opposing party as soon

20  as possible, so if I were here as an adversarial --

21  (unintelligible) counsel these cases have been very active with

22  each other and that is --

23         THE COURT:  Okay.  And let me interrupt, I apologize,

24  Mr. O'Mara, I meant to ask you a question at the very

25  beginning.  I understand from the latest filings that came down

1   this afternoon that the state court case that was pending up in

2   Carson City and up in the Nevada Supreme Court, that that has

3   been settled, and is it now dismissed?  Is that case over?

4           MR. O'MARA:  I do not know the answer to that

5   question, Your Honor.  There was a stipulation in -- the last I

6   had heard and maybe I'm just not up to date, is that there had

7   not been a completed stipulation in that case.  However, I

8   don't believe that that case is relevant to my state claims

9   here today because they are separate people, separate claims

10  and they have separate harms, remedies by the court.

11          THE COURT:  Okay.  All right.  Thank you.  I didn't

12  mean to interrupt.  Go -- I did mean to interrupt, but thank

13  you for addressing that.  Now go ahead with your argument.

14          MR. O'MARA:  Great.  Thank you.

15          Your Honor, I understand you have read the briefs and

16  I just want to go into the two issues:  One issue is whether or

17  not the Registrar of Voters of Clark County should be able to

18  preclude the public from actually having the -- an opportunity

19  to view and monitor and observe county procedures which are to

20  be made public.  And, so, you know, there's -- there's

21  basically two statutes that we cited.  We cited both statutes,

22  N.R.S. 293.8881 specifically says the county procedure must be

23  public.  The second statute is N.R.S. 293.363.  That also says

24  when the polls have closed, county procedure must be public.

25          Now, Mr. Prudhome went there and attempted to view the

2:20-cv-2046-APG-DJA - November 6, 2020

1   county process and he, as my declaration says, and his said as

2   well, claims that he's not getting adequate public viewing of

3   the procedure.

4           Now, what we have to look at is we're here today at a

5   public hearing.  And the way the registrar of voters has it set

6   up is that the public viewing is allowed to watch through a

7   glass partition to see where they are.  They're not within a

8   reasonable viewing distance.  They're about 10 feet away.  They

9   have a partition.  They can't see what's going on, and most

10  importantly they can't hear what's going on.  And, so, that's

11  not a public procedure that is open to the public.  You may be

12  able to look and say, oh, I wonder what they're doing today,

13  but you don't understand what they're doing, you can't see what

14  they're doing, and most importantly you can't hear what they're

15  doing.  And that's important because here we are today and if

16  we were in your courtroom, all of these people on the phone

17  would have been able to walk into your courtroom, they would

18  have sat in the gallery, they would have been able to listen,

19  they would have been able to see what their lawyers were doing,

20  but what -- what the registrar is doing is -- if we were in a

21  court, would put a glass partition between the bar and the

22  gallery and the people would not be able to see or not be able

23  to hear what was going on, they would just be able to see some

24  actions about the lawyers.  And we have it here today on Zoom

25  and the new technology.  It would be akin to you -- the Court

———2:20-cv-2046-APG-DJA - November 6, 2020———

1   having a public hearing as you are now but putting everybody on

2   the telephone on mute, or if they were on Zoom, on mute to

3   where all they would be able to do is see what the lawyers were

4   doing.  That's not open to the public.  That's not sufficient.

5           And there isn't a --

6       (Court reporter admonishment).

7           MR. O'MARA:  So, Your Honor, what we're here about is

8   there has to be a meaningful observation of the public to view

9   the counting of the ballots.

10          Now, there is an opportunity to be able to be 6 feet

11   away if that's the requirement in regards to Nevada.  You could

12   probably be closer, but 6 feet away, they can watch, they can

13   hear, they can actually publicly observe the counting of the

14   ballots.  So, what we're asking for is for them -- for the

15   registrar to comply with the statutory provisions for counting

16   to the public.  It has to be a public that -- where the public,

17   just like any hearing or any public open meeting where you get

18   the opportunity to see what's going on and what is -- what you

19   can hear.  And if you're not within 10 -- 6 feet and able to

20   see or actually see the devices in which the machines are being

21   used, then that is not open to the public, it's just basically

22   nothing.  You get nothing out of it, and it basically makes

23   that statute a nullity.  It nullifies the legislative intent

24   that we are entitled, or this -- my client is entitled, as well

25   as any other public official or public citizen, to go in and

—2:20-cv-2046-APG-DJA - November 6, 2020—

1   have the counting open to the public.

2           THE COURT:  All right.  Let me -- let me interrupt,

3   Mr. O'Mara, and ask you this, because your motion simply asks

4   that the defendants should be required to allow meaningful

5   access to the ballot-counting process.

6           MR. O'MARA:  That's right.

7           THE COURT:  What are you asking for?

8           MR. O'MARA:  Yeah.  So, Your Honor, I'm asking for

9   them to be within a -- at least a 6-foot area where they can

10  see and hear the actual counting and what has been said in

11  regards to the ballot counting.

12          THE COURT:  What if we have -- well --

13          MR. O'MARA:  Well, let me -- let me just say something

14  to Your Honor.  There -- there was an issue up in Washoe County

15  and what happened was is the balloting procedure -- or the

16  watching of the polls was being really kind of difficult

17  because Washoe County was only allowing three -- or two people

18  to view in a location for 1 hour, and that was causing a lot of

19  problems because some were getting to the polling location and

20  they would get kicked out in an hour.  We would have people

21  that would come in with their friends and then they would be

22  maybe, probably, from the same political party, or they

23  wouldn't and, so, they worked with them.  And what they did was

24  is they had a system, three chairs:  You had a Republican

25  chair, a Democrat chair and an Independent chair.  Those chairs

2:20-cv-2046-APG-DJA - November 6, 2020

1    are specifically for those three options and if someone was to
2    leave and there was no -- say, no Democrat viewer, then anybody
3    would be able to come in and watch, if there was no Republican,
4    then a Democrat would be able to come in and watch until one of
5    them was able to be able to do this.

6         Now, I -- I don't think that, you know, in a normal
7    situation, that that is adequate because the public should be
8    able to do it, but everybody keeps on saying this is COVID
9    times and we have to make COVID -- we have to make COVID
10   provisions.  And, so, in order to do that you have three major
11   entities, you have a -- two major political parties and
12   everybody else and, so, I think that in order to draft an
13   injunction, to allow for a remedy that will benefit everyone,
14   is to have such observation and have a system where if no one's
15   there, then another person can come in, or you have it to where
16   the interested party -- especially in this case, you have two
17   interested parties, you have the campaigns and you have -- you
18   have the Democratic party and the state party.  So, you can
19   draft the injunctive relief to say we're going to have three
20   people -- up to three people for 6 -- no farther than 6 feet
21   that allows them to monitor and hear the counting and the
22   actual counting of the ballots.

23        THE COURT:  Mr. O'Mara, isn't that the legislature's
24   job, not mine?

25        MR. O'MARA:  Well, Your Honor, your job is to make

—————2:20-cv-2046-APG-DJA - November 6, 2020—————

1  sure that the statutes are implemented in a way that allows for

2  them to be viewed.  And, so, the Court is being asked to step

3  in and tell our voters, you are not -- this is not open.  It

4  happens all the time where the courts look at, is this a public

5  hearing, was it open, was it -- and that court allowed us to

6  look at it and say, no, you have to make it open to the public.

7  And case law shows that open to the public means you have to

8  have meaningful observation where you can hear and partici- --

9  mostly in campaigns, the case law says you can participate, and

10  we don't have that here, so you have the other three, which is

11  to hear and to understand and to see what is going on so that

12  later on you can participate and find out what -- what

13  happened.  I mean, if you don't have an avenue for a public

14  meeting or a public observation and the person is just standing

15  out watching nothing, then they have no opportunity to actually

16  be a part of the public viewing because they can't --

17  whatsoever afterwards to say, I saw something, it wasn't right,

18  this is what happened.  And, so, that basically means that that

19  statute's a nullity if the registered voters aren't allowed to

20  continue on with this process.

21          THE COURT:  Let me ask you to respond to

22  Justice Kavanaugh's concurrence in the case of *Democratic*

23  *National Committee vs. Wisconsin State Legislature* that was

24  decided about a week or so ago, on October 26th, where Justice

25  Kavanaugh, in his concurrence, said that "even seemingly

2:20-cv-2046-APG-DJA - November 6, 2020

1   innocuous, late-in-the-day judicial alterations to state

2   election laws can interfere with administration of an election

3   and cause unanticipated consequences."  He went on to say that

4   "it's one thing for the state legislature to alter their own

5   election rules in the late innings, but it's quite another for

6   a federal district court to swoop in and alter carefully

7   considered and democratically enacted state election rules when

8   an election is imminent."  I'll add to that, when it's already

9   undergone and the counting's going on.

10          Why should I -- you're asking me, it seems, to ignore

11  Justice Kavanaugh's direction -- yes, it was only a

12  concurrence -- but isn't that a good counsel to a judge like me

13  to not step in and interfere with these administrative

14  proceedings that you're telling me to do?

15          MR. O'MARA:  Well, I don't -- there is no -- you're

16  not stepping in and involving yourself in the administrative

17  proceedings.  You're not causing the administrative proceedings

18  to be changed.  What you're doing is allowing for the

19  administrations to be conducted in the method in which the

20  state law requires, which is to be open to the public.  We're

21  not asking you to change anything, Your Honor; we're asking you

22  to be able to say you need -- as the registrar, need to follow

23  the state law so that the administration of the election is

24  actually moving forward under the law, instead of an arbitrary

25  decision by the Registrar of Voters to keep people away from

─────2:20-cv-2046-APG-DJA - November 6, 2020─────

1  the public -- the public away from viewing a publicly open

2  ballot counting, which is what is happening.  So we're not

3  asking you to change the law, Your Honor; we're asking you to

4  tell the Registrar of Voters, you need to make a meaningful

5  policy -- a meaningful enforcement of the actual election laws

6  in which you are going to do.

7           I mean --

8           THE COURT:  Okay.  Let me follow up -- let me follow

9  up --

10      (Simultaneous cross-talk).

11          MR. O'MARA:  -- the Court to be aware of.  Sorry.

12  I'll hold that back.  I'm sorry.

13          THE COURT:  Thank you.  Let me -- let me -- I need to

14  do two things:  One, let me -- I need to ask everyone on the

15  phone to please mute your phones and your microphones.  We're

16  getting interference and noise in the background, so anyone,

17  public, media, parties, whoever else is not speaking, that is

18  the lawyer, please mute your phones and microphones so that we

19  can -- I can hear the lawyers.

20          Mr. O'Mara, I want to get to a practical standpoint

21  because you're asking me to impose some new standards or

22  strictures or guidelines that -- that the defendants would have

23  to follow.  And you want to be able to see and to hear what

24  they're talking about.  So, hypothetically, if I have, or if

25  the defendants have someone who is counting the ballot who is

──────2:20-cv-2046-APG-DJA - November 6, 2020──────

1  very soft-voiced, or is whispering, or is hoarse, do we have to

2  provide them microphones?  Do we have to say, hey, you need to

3  speak up so everybody can hear them?  I mean, at what point

4  does this get to the ridiculous?

5          MR. O'MARA:  Your Honor, I -- I -- I mean, you can

6  come up with a lot of things in regards to that, but if the --

7  if the person is talking softly and the other election

8  officials can hear them, then they would be able to be heard.

9  I mean, the problem is, is that if you don't allow for a

10  viewing, then it makes the statute a nullity and it makes it to

11  where why even have the statute?  I mean, the --

12          THE COURT:  Okay.  But -- okay.  But, your client --

13  your client did view -- I'm reading his affidavit.  He was

14  allowed to view.  He didn't like where he was put, but he was

15  put, at least in Paragraph 5 of his declaration, said that

16  "they directed me to another area of the location where I would

17  not be able to fully observe.  My understanding was that was

18  for people who were only media."  So he was placed, apparently,

19  by his own statement, in the media area.  Then he says, in

20  Paragraph 6, that "regardless, they did not accept my media

21  credentials.  I remained in the observer area as an observer."

22  So he's been in the media area; he's been in the observer area.

23  I -- he's viewing.

24          MR. O'MARA:  But he's -- Your Honor, it's -- it says

25  that. . . it says that "directed me to the area where I would

2:20-cv-2046-APG-DJA - November 6, 2020

1   not be able to fully observe."  So, if I keep on moving him

2   back and forth to one specific area where he apparently can

3   observe maybe (unintelligible) that way and then he cannot

4   fully observe, there -- it is not open to the public.  There is

5   different people that get to see things and different people

6   that don't get to see.  And that --

7           THE COURT:  So I -- so we need to open it to anybody

8   in the world that wants to come?

9           MR. O'MARA:  No, Your Honor, and that's why -- I mean,

10  I -- I mean, the statute is put into place that counting must

11  be open to the public.  And, you know, and what I was telling

12  you about is that the argument is always going to be that COVID

13  does not allow for the general public to be able to come in in

14  mass numbers or in relatively larger numbers and therefore it's

15  got to be a smaller amount of area for them to view and it's

16  got to be farther away from the location of where the ballots

17  are being counted.  And, so, you have to -- it's -- you can't

18  let COVID run everything and allow the -- the statute to be

19  nullified when you can -- you can move the parties that are

20  interested in watching the count to be able to see and hear and

21  be a part of the public viewing of the counting.

22          THE COURT:  And what in your client's affidavit or

23  declaration says that he could not observe?

24          MR. O'MARA:  Well, it says, "They directed me to

25  another area where I would not be able to fully observe."

Heather K. Newman, RPR, RMR, CRR, CCR #774

2:20-cv-2046-APG-DJA - November 6, 2020

1          THE COURT:  And then he apparently was moved to a

2   different area, the observer area.  Doesn't say he couldn't

3   fully observe there.

4          MR. O'MARA:  But he --

5          THE COURT:  What specifically did your client not get

6   to see?  What specifically does your client want me to let him

7   see that he hasn't been already?  I -- you're asking for

8   extraordinary injunctive relief.

9          MR. O'MARA:  Right.

10          THE COURT:  It needs to be narrowly tailored and what

11   I'm not hearing is any narrow tailoring of what you want me to

12   do.  I can speak in great platitudes, yes, it should be open to

13   the public.  That doesn't help us with an injunction.

14          MR. O'MARA:  Right, and as I was talking about

15   earlier, and you talked about how -- the administration effects

16   and things of that nature.  What -- we would like an injunctive

17   relief to require the Registrar of Voters to place my client,

18   and anyone in a similar situation, to be able to monitor the

19   election, counting, within a 6-foot, no longer -- no farther

20   than 6 feet where he can see and hear the actual counting of

21   the ballots.  It's a very specific, less than 6 feet -- I mean,

22   if they can put him 4 feet and that is available, then we would

23   like 4 feet.  If it's 6 feet, that would be the location where

24   we believe that he would be able to hear and see the actual

25   counting of the ballots.

1          THE COURT:  And if I don't put specific measurements

2    in there, I just say it's got to be where he can see and hear,

3    isn't that exactly the problem we're in right now with the

4    statute that says meaningful review or whatever it is,

5    meaningful view?

6          MR. O'MARA:  The statute says -- (unintelligible).  If

7    you -- you want it to be narrowly tailored so that the remedy

8    actually, you know, provides for a remedy that will be

9    sufficient to satisfy the statute, which is, you know, what we

10   believe is 6 feet.

11         THE COURT:  All right.  And who is similarly situated

12   to your client?  Since you want that in the order, who is

13   similarly situated?

14         MR. O'MARA:  Well, it's open to the public,

15   Your Honor, so that's why I was talking to you earlier about,

16   you know, in regards to what the registrar or what I believe

17   maybe the registrar may argue, the Secretary of State may argue

18   is that, look, we're in a COVID situation, we don't want to

19   have, you know, 10 or 15 people watching the counting of the

20   ballots and that's therefore I was talking about how

21   Washoe County utilizes a system where they would allow for the

22   monitoring of the polls and then they would. . .  I'm sorry,

23   Your Honor.  They would monitor the polls and they would allow

24   for a specific party to have a chair and then an Independent

25   party to have a chair and things of that nature.  We have two

─────2:20-cv-2046-APG-DJA - November 6, 2020─────

1   parties that are -- well, we have two campaigns and a party

2   that are involved in these cases and therefore you can -- you

3   can generally look at there's two sides of the aisle and then

4   you put in a third.  It would work in order to narrowly tailor

5   something to where the viewing location would be.

6           THE COURT:  Why is that your client?  Why does he get

7   one of those chairs?

8           MR. O'MARA:  Well, he would get one of those chairs

9   because he's bringing this action.  He's the one that wants to

10  view it.  He's the one that wants to have this open for the

11  public.  But if you -- they -- if the Registrar of Voters

12  wanted to have it to where I was just talking about where the

13  viewer has to designate an interested party, which is a

14  Democrat party, a Republican party, and a non-party, he would

15  have to designate himself to what that would be, and maybe

16  that's, you know, a media access where one media person -- and

17  you'd have four chairs that would allow for it to be close

18  enough in that regard.

19          THE COURT:  And then -- and then someone comes up and

20  says, I want to be the Democrat, or I want to be the Republican

21  or I want to be the Independent, your client gets to kick them

22  out?

23          MR. O'MARA:  You would -- well, no, you would not kick

24  that person out, but you could move them and rotate them in on

25  a basis that would allow for a public viewing.

—2:20-cv-2046-APG-DJA - November 6, 2020—

1          Look, I mean, we're -- I would -- I would love to tell

2     you and I would -- I would make the argument today that it has

3     to be open to the public and that the Registrar of Voters has

4     to make accommodations so that it is open to the public so that

5     anyone that comes in can do that, but I acknowledge that

6     there's going to be an argument probably that says we cannot do

7     that because of the COVID restrictions put in place and then

8     based on --

9          THE COURT:  I don't mean to be facetious, but you're

10    asking me for extraordinary injunctive relief that has to be

11    narrowly tailored and as we're walking through this, it occurs

12    to me that you're forcing me to get way down deep in the weeds

13    and then we're going to be right back here if I put something

14    in place when two other people claim they're the public and

15    they want to watch and all of a sudden we've got them on a --

16    you know, I've got to alter it again and again and again.  I --

17    anyhow, we're getting far afield on that.

18          Turn to the issue of Ms. Stokke -- I don't know if I

19    mispronounced her name, how do you pronounce it, Stokke or

20    Stokke?

21          MR. O'MARA:  Yes.

22          You want me to start, Your Honor.

23          THE COURT:  Well, yeah, I guess the question is, I

24    want to make sure we're clear, you're not asking me to stop the

25    defendants from counting ballots --

2:20-cv-2046-APG-DJA - November 6, 2020

1          MR. O'MARA:  That's correct.

2          THE COURT:  -- right?

3          MR. O'MARA:  We're not asking you to stop the

4    Registrar of Voters to count ballots.  What we're asking you to

5    do today is to stop them from using the Agilis machine to

6    verify the signatures during that process.  So, as -- as the

7    Secretary of State put in her declaration, they're saying that

8    70 percent of them are already going to have to go through the

9    process anyway, so there's only 30 percent.  So, we're only

10   asking you to set aside -- well, to make sure that -- that the

11   Agilis machine is not used any further as we move forward, to

12   just keep the status quo of making sure the statute is

13   enforced.  And, so --

14          THE COURT:  Okay.  So let me ask -- you're fine, and

15   again, I apologize for interrupting, and my court reporter is

16   going to hate me, but I have to -- I want to keep this going

17   forward.

18          I want to make sure factually we're all on the same

19   page.  Your complaint says that Ms. Stokke tried to vote on

20   November 3rd.  Her affidavit says she tried to vote on

21   October 28th.  Which is the correct date?  Which am I to

22   believe.

23          MR. O'MARA:  I would believe the declaration,

24   Your Honor.

25          THE COURT:  Okay.  So if she tried to vote on

Heather K. Newman, RPR, RMR, CRR, CCR #774

2:20-cv-2046-APG-DJA - November 6, 2020

1  October 28th, why did she wait 8 days, until November 5th, to

2  do something about it?  Why isn't that claim barred by laches

3  or something else?

4        MR. O'MARA:  Yeah.  So, well -- okay.  So, as the

5  declaration says, Your Honor, on October 28th is when she found

6  out.  She was told by the county clerk's office, or the county

7  registrar's office that they would get back to her in regards

8  to her ballot.  They did not, so she drove back down there and

9  that's when Gloria went back in -- Mr. Gloria was there

10  involved in the (unintelligible).

11        To say that she is going to be barred by laches, an

12  elderly woman who has had her vote taken from her because of a

13  5-day period or even more, for laches, is a little bit

14  unreasonable.

15        THE COURT:  Okay.  But why -- why did she wait 7 days?

16        MR. O'MARA:  I don't know the answer to that question,

17  but she -- obviously, she didn't wait to try to get her vote.

18  What happened was is on the 28th she wanted to vote.  She tried

19  to go in and vote.  They told her no.  On the 29th she went

20  back in then because the Registrar of Voters did not go forward

21  with that.  You have her on the 29th, which is a Thursday, you

22  have a holiday Friday, Saturday, Sunday, and then you have

23  what's going on.  It takes a little while to get things going

24  and figuring out that what has happened to her was wrong.  She

25  can't -- you can't say to an 80-year- -- or I don't know, I

2:20-cv-2046-APG-DJA - November 6, 2020

1   can't say what her name -- age is, but an elderly woman that,

2   you know, you tried everything you could, you went to the

3   registrar's office, you demanded that they give you the vote,

4   you didn't get the relief you want, you try to find out what's

5   happening, you finally get someone that's going to help you and

6   you come in 7 days later and the Court says, sorry, you know,

7   your vote doesn't mean anything to where we're going to allow

8   you to make the argument and laches applies.  No --

9          THE COURT:  Okay.  Listen, and -- laches may be

10  overstating.  I don't dispute that, but -- but the delay --

11  often in a TRO situation, when someone delays seeking relief,

12  that sort of factors into my consideration of immediate and

13  irreparable harm, if not the balance of hardships and equities.

14  So should I just ignore that 7-day delay?

15         MR. O'MARA:  Well, I mean, I -- obviously, you can't

16  ignore any facts, I'm not asking the Court to do that, but you

17  have to take that into context of what we have here.  We have a

18  citizen of Nevada who has put her trust in a system that has

19  been enforced, or that she believes is being run properly by

20  the Secretary of State's Office and the Registrar of Voters

21  Office and she -- she believes that they are following the law,

22  that they're requiring the proper (unintelligible).  And then

23  she goes in and she finds out that her vote is not counted.

24  And then she finds out that there is something wrong with the

25  system.  I mean, they're going to make an argument that she

2:20-cv-2046-APG-DJA - November 6, 2020

1    doesn't even know about the fact that there's an argument about

2    the Agilis machine, she probably doesn't even know that the

3    Agilis machine is being used instead of what we believe to be

4    the right method.  She has her faith in the elections officials

5    and the -- what those elections officials do, they don't do

6    anything for her except for tell her that's -- you're not going

7    to be able to vote because someone else did it for you.  And,

8    so --

9         THE COURT:  Well, that's -- that's not what the

10   affidavit that the -- the defendants filed an affidavit -- or

11   the report says that they offered her, if she would fill out an

12   affidavit basically saying, you know, this isn't my original --

13   that vote wasn't mine and they would let her do a provisional

14   ballot and she said no.

15        MR. O'MARA:  The provisional ballot does not include

16   every single election.  The provisional ballot is basically --

17   that still takes away her First Amendment right, or her right

18   to vote.  The provisional ballot is only used when -- when you

19   don't have the proper mechanisms in place for your

20   registration.  She registered, she went to go vote, and she was

21   denied the right to vote for every candidate that she is

22   entitled to under the ballot.  So to --

23        THE COURT:  But if -- if it was determined that her

24   signature on the original ballot was improper, then they would

25   have counted the provisional ballot; correct?

—2:20-cv-2046-APG-DJA - November 6, 2020—

1       MR. O'MARA:  I'm sorry, Your Honor, I did not hear

2   your question.

3       THE COURT:  I'm sorry.  I'm concerned about the

4   provisional ballot here.  What I understood the situation to be

5   was she raised the issue with Mr. Gloria saying, hey, somebody

6   used my name or signature.  Mr. Gloria said fill out,

7   basically, this affidavit saying that that original ballot was

8   not your signature, we'll let you cast a provisional ballot and

9   in the event it turns out you're right, somebody forged your

10  name, we will then count your provisional ballot.  Why is that

11  not an adequate remedy?

12      MR. O'MARA:  Because the provisional -- first of all,

13  if you look at her declaration, it says that they said that she

14  had to attest that her roommate possibly stole the ballot,

15  which she has no -- she can't do and, so, she felt very

16  pressured by Mr. Gloria to sign that.  Second, a provisional

17  ballot is not a ballot.  The ballot has been taken from her.

18  She doesn't get to vote her ballot.  The provisional ballot

19  would only allow her for some, but not all, and many --

20  basically not the majority of the elections that she wanted to

21  vote for.  It's not an adequate remedy.  The adequate remedy

22  would have been -- instead of having the Agilis machine move

23  forward, it would have been to have the actual clerk or the

24  employee of the clerk check the signature in the first place

25  and then go through the proper procedures, but that didn't

————2:20-cv-2046-APG-DJA - November 6, 2020————

1    happen.

2            THE COURT:  All right.  So, what in her affidavit says

3    that her problem was caused by the Agilis machine?  And I know

4    the answer is nothing because it's not there.

5            MR. O'MARA:  Right.

6            THE COURT:  And I get it, maybe she doesn't know.

7    What evidence do you have that the Agilis machine caused this

8    problem that's in front of me?

9            MR. O'MARA:  Well, I don't believe we have any

10   evidence to show that her machine went through the proper

11   procedures.

12           THE COURT:  Then -- then why do I grant extraordinary

13   relief if you don't have evidence to support a likelihood of

14   success on the merits?

15           MR. O'MARA:  Because the likelihood of success on the

16   merits is to show that the Agilis machine was not to be used at

17   all, and they weren't, and it was used and, so, therefore our

18   allegation was is that it did go through the Agilis machine.

19   And I think it's based upon. . . I -- I -- you know, I can't

20   say that, Your Honor, because my understanding was is that she

21   was told that they looked at the machine, the signature, and

22   the printout, which I believe there is a printout of the Agilis

23   machine signature that they would be able to compare and show

24   that that's why it went through, but I --

25           THE COURT:  So -- so somebody -- so somebody, after

———2:20-cv-2046-APG-DJA - November 6, 2020———

1   she points out the error, somebody compared that signature to

2   hers, and it was identical.  That's the human interaction

3   you're requested.  So that happened, so regardless of --

4           MR. O'MARA:  After.  After.

5           THE COURT:  Okay.  But cured it on the back end.

6   What's there to fix now?  It was cured on the back end and she

7   was given the chance to do a provisional ballot.  Isn't the

8   system working the way you want it to when --

9           MR. O'MARA:  No.

10          THE COURT:  -- when you want human inter- -- you

11  wanted human interaction, you got it.  They compared it, it was

12  identical.  You may disagree with that, but if the Agilis

13  machine didn't exist, you'd still have somebody comparing the

14  signature and coming to the same conclusion.

15          MR. O'MARA:  No, because her ballot has already been

16  stolen because it was allowed to be counted improperly because

17  (unintelligible).

18          THE COURT:  Excuse me.  Is there a remedy for that.

19          MR. O'MARA:  If I could step back for just a second,

20  Your Honor, and try to frame it for you so that we're not going

21  down a rabbit hole.

22          The method in which the Agilis machine is used, okay,

23  is that the machine pumps everything through and if it doesn't

24  match, it pumps it out, but 30 percent of those get forwarded.

25  And our allegation is that her ballot went through, okay, and

—————2:20-cv-2046-APG-DJA - November 6, 2020—————

1    it -- through the Agilis machine and it was not flagged.  Okay?

2    It was then counted, and then her ballot was taken from her.

3    Because of the improper use of the Agilis machine, we have a

4    vote and a disenfranchisement of my client.  That's -- point

5    blank right there that is a problem with the Agilis machine and

6    the ability of having people's votes taken in her case.  To

7    connect --

8              THE COURT:  Okay.  Now you --

9              MR. O'MARA:  Then to come back and, say, oh, we came

10   back and we looked at it but we're going to cure you by giving

11   you a provisional but we still have to show that, you know,

12   your ballot wasn't counted, doesn't get to the remedy of what

13   happened by using an improper machine and therefore --

14             THE COURT:  Okay.  All right.  So if there was no

15   Agilis machine, a human being would have taken the signature on

16   the ballot, compared it to the signature on the paper and come

17   up with the same conclusion that they have right now.

18             MR. O'MARA:  Well, we don't know that.

19             THE COURT:  How would -- you had a human being look at

20   it and they said it looks to be the same thing, at least that's

21   the report from the defendants.  It says we went back and

22   looked and it -- compared and it was identical.

23             MR. O'MARA:  Okay.  And did they -- did they

24   produce -- I don't believe that that was produced, the

25   signatures were produced.  Were they not?

2:20-cv-2046-APG-DJA - November 6, 2020

1          THE COURT:  I don't recall seeing them right now,

2    but. . . I just got to deal with the information and evidence I

3    have in front of me and that's their response.

4          MR. O'MARA:  I -- I understand.  And I -- is this the

5    Secretary of State's response, Your Honor?

6          THE COURT:  I believe so.  We'll get to them in a few

7    minutes and see.

8       (Brief pause in proceedings).

9          THE COURT:  Yeah, in the -- actually, I'm looking at

10   the Memorandum of Interview, this is ECF Number 19 at Page 52.

11         MR. O'MARA:  I'm not sure if I have that yet, so let

12   me just please go -- give me a second and I can bring that up.

13         THE COURT:  Sure.  She -- she apparently told the

14   Secretary of State's investigator that she went to the

15   elections headquarters to address the matter, spoke directly to

16   Joe Gloria.  Gloria told her the signature on the ballot

17   received on October 14th, 2020, matched the signature she had

18   on file with the registrar's office.  My recollection is, and

19   maybe this was -- well, I don't know.

20         MR. O'MARA:  That is made by the declaration of the

21   Secretary of State's Office, Your Honor, and, so, I don't

22   understand where that would -- if the clerk and the -- or the

23   employee needs to be able to be the one to look at it.  So.

24   There's nothing in there to say it wasn't matched up with the

25   signature based on the Agilis machine.

1      THE COURT:  Okay.  I cut you off.  Anything else?

2      MR. O'MARA:  Well, you know, Your Honor, I think that

3 I want to address the one thing in regards to the Democratic

4 party claim that the machine is allowed under the statute.

5      Interestingly, the Democratic party only puts in

6 partial statutory language in regards to the use of the

7 machine.  As the Court will see from N.R.- --  in the N.R.S.

8 statute allows for procedures and policies to be put into

9 place.  It also restricts and precludes the Registrar of Voters

10 from putting in any policy or procedure that conflicts with

11 other statutory alignment.  And it's interesting that the

12 Democratic party doesn't put that in there where it says

13 it's -- precludes any conflict -- they can't be in conflict

14 with any other provision.  And when you look at the statute, it

15 specifically says "shall."  It specifically says that the

16 registrar, in this case what he considers the clerk, or his

17 employee, must check the ballot and the signature -- I'm sorry,

18 must check the signature.  When the Agilis machine gets put

19 through and there's not a -- when there's not a determination

20 by the clerk or the Registrar of Voters or some employee, then

21 it's not following the standards and therefore not only is my

22 client, Ms. Stokke, harmed, but so is my client Merchant for

23 Congress and Rodimer for Congress who they have an interest in

24 this to make sure that the election is properly set forth.

25 There's no policies and procedures that are written that I am

2:20-cv-2046-APG-DJA - November 6, 2020

1   aware of in regards to how the machine is going to be used,

2   whether or not it -- how it is checking it, whether it's being

3   used based upon the manufacture's suggested usage or if it's

4   been monitored or if it's been changed or if it's been changed

5   throughout the election.  We don't run elections in Nevada, and

6   we have historically had it to where Nevada law has

7   specifically said, in regulations, that have to be promulgated

8   by the Nevada Secretary of State.  In this case, we don't have

9   any written policies or procedures for the public to know or

10  anybody to understand, and if you don't allow everybody to

11  understand what the rules of the election are and then you just

12  implement something that is not entitled under the law, such as

13  the Agilis machine, then the act of using the machine is a

14  futile act that is not authorized by law.  It cannot occur to

15  happen.  And, so, therefore, that's why we're here today to ask

16  you to push pause, let us -- enter a Temporary Restraining

17  Order to say you don't have to stop counting, but you need to

18  stop using the Agilis machine, start verifying through the

19  proper procedure under the statute, which is N.R.S. 293.8874,

20  and the procedure is that the clerk or employee shall check the

21  signature and if the clerk and signature, then they go to

22  whether two employees [sic].  That's a human interaction that

23  has to go before the vote is actually counted.  That's the

24  processing of the votes.  So --

25              THE COURT:  Let me -- let me interrupt and ask you

1  this:  My understanding is that state district Judge James

2  Wilson, in Carson City, had an Evidentiary Hearing on this

3  issue, not necessarily your client's, but looked at the Agilis

4  system and made a determination that if it was not used and

5  they had to look at each one of these by hand or by eyeball,

6  that it could not be completed by -- a canvass could not be

7  completed in the statute time frame.  So what you're asking me

8  to do is to do something that Judge Wilson has already found

9  can't be done under the statutory time frame.

10           MR. O'MARA:  Well, in order --

11           THE COURT:  Tell me, why isn't that a hardship that

12  favors the state more than your client?

13           MR. O'MARA:  Okay.  So, Your Honor, to answer that

14  question, it is my understanding that while Mr. Gloria

15  testified that he could not get it done, he then published and

16  provided information of when he was going to actually do the

17  verification and provided a mere approximately 8 hours over the

18  next period of time to actually do the signature verifications.

19  So, it wasn't that they couldn't get it done, they just weren't

20  going to spend time on it throughout the process.  It would

21  only allow for 8 hours over the next approximate 2-week period

22  to do verifications, or -- or at least a minimum of 8 hours

23  from the time of the hearing to the Election Day.  So -- so to

24  say that there is going to be a harm, they can get it done.

25  We're asking them to segregate the ballots in regards to the

1   ones that have already ran through the Agilis machine and have

2   not been viewed by a member of his staff or him in the first

3   place, and then the ones that he's processing, which I believe

4   would only be an additional 30 percent of what they have left,

5   will then -- if they choose to, they can run it, you know,

6   through the -- well, they will -- they will then be able to use

7   the human aspect as required by the statute to verify

8   signatures and keep the vote going.

9        THE COURT:  So, just so I'm clear, does -- I wasn't

10  quite sure I followed.  You're suggesting that Mr. Gloria said

11  they could get this all done in 8 hours?

12       MR. O'MARA:  No.  No.  He said that they couldn't get

13  it done but then told -- then provided information to the

14  public that said he was only going to allow for an 8-hour

15  period over in the next -- I -- I -- I said 2 weeks,

16  Your Honor, and I can't make -- then I corrected myself because

17  I cannot make that assertion, but I believe it was either that,

18  or it was over a period of the next period of days before the

19  election that they were going to --

20       THE COURT:  So let me ask it a different way.  What do

21  you believe -- how long do you think it will take for them to

22  finish the task if I tell them you have to review all these by

23  eyeball?

24       MR. O'MARA:  Well, it's my understanding that they

25  would be able to be done by tomorrow -- or Saturday.  And, so,

——2:20-cv-2046-APG-DJA - November 6, 2020——

1  if they have an additional 30 percent out of the hundred that

2  they have to do, then they're only looking at maybe Sunday or

3  early Monday at the latest.

4          THE COURT:  So you're saying I should order them to

5  review -- whatever remaining ballots there are, review those by

6  eyeball and not use the Agilis machine?

7          MR. O'MARA:  Right.  What I'm asking you to do is to

8  have them follow the statutory provisions that require the

9  clerk to first verify -- to require the clerk, or his employee,

10 to check the signature used on the ballot against the signature

11 of the voter and go through the proper process set forth in

12 293.8874, and then I would like you to have that -- in regards

13 to the other ones that have not been -- that have gone through

14 the Agilis machine already, because they -- we believe that

15 those are also invalid in regards to not going through the

16 system properly.  Those should just be segregated, and then we

17 can come back Monday or Tuesday and have an Evidentiary Hearing

18 to determine what to do with those ballots because they have

19 been processed without the clerk or the employee checking the

20 signature.

21         THE COURT:  How long is it going to take, in your

22 estimation, for the defendants to eyeball all of the remaining

23 ballots?

24         MR. O'MARA:  So, I -- it's my understanding that

25 they -- that the Registrar of Voters believes that he will be

————2:20-cv-2046-APG-DJA - November 6, 2020————

1    done counting by tomorrow afternoon.  So if you take 30 percent

2    additional, then -- from today, then there's less than

3    36 hours, so it would be, like, Sunday or Monday morning.

4              THE COURT:  Okay.  If we require them to go back and

5    eyeball all of them that you're requesting, next week, how long

6    is that going to take?

7              MR. O'MARA:  Well, that would take significantly a lot

8    more time, Your Honor.  And there's 30 percent, so you would

9    have to take into consideration how much time they spent in

10   regards to counting those ballots, and I don't know the answer

11   to that.

12             THE COURT:  And -- and do you have any reason to think

13   that would not take it beyond the statutory canvass period?

14             MR. O'MARA:  I don't have any -- I believe that if

15   they were to sit down and do the 30 percent of the ones that

16   have not been through the Agilis machine, and we don't -- we're

17   only talking about mail ballots, we're not talking about

18   ballots that were --

19             THE COURT:  That's not what I'm asking because you

20   asked -- you said you want them to go back and do the eyeball

21   of all of them that went through -- the 30 percent of all of

22   them that went through the Agilis machine next week after the

23   Evidentiary Hearing --

24             MR. O'MARA:  Right.

25             THE COURT:  -- that process would take beyond the

1    statutory mandatory canvass period; right?

2             MR. O'MARA:  I don't know that to be true, Your Honor,

3    but I would imagine that that's what the Registrar of Voters is

4    going to argue but if they are -- if they finish counting and

5    they have the staff, they should immediately go to close that.

6    But you can't state to the American people, well, really, the

7    Nevada citizens that we are not going to go back because of the

8    time frame and try to make sure that this election was actually

9    conducted under the statutes implemented by AB 4 and then

10   codified in the statutes that specifically say that a clerk or

11   employee shall check the signatures.  It is imperative that

12   Nevadans know that it was not a deal between the Secretary of

13   State's Office and Clark County that has a different system for

14   Clark County to verify signatures than any other county, that

15   it's not within the statutory provision and then, say, well,

16   sorry, because we did this wrong and we ran out of time, we're

17   not going to try to redo it properly.  Nevadans deserve to have

18   their elections conducted under the law.  The law

19   specifically states --

20            THE COURT:  I understand.

21            MR. O'MARA:  -- clerk or employee.

22            THE COURT:  I understand.  All right.  I -- anything

23   further before I turn to the plaintiff -- or to the defendants?

24            MR. O'MARA:  No -- I mean, Your Honor, I would make

25   other arguments but if you have other questions, then I can

———2:20-cv-2046-APG-DJA - November 6, 2020———

1   respond to their arguments after that.

2           THE COURT:  Yeah, that's got most of them.  Let me

3   give them a chance to speak and then we'll come back to you.

4           MR. O'MARA:  Thank you, Your Honor.

5           THE COURT:  All right.  You're welcome.

6           Mr. Newby or Ms. Miller, I don't know who's going to

7   go first.  Mr. Newby I'll turn to you to see if you want to go

8   first.

9           MR. NEWBY:  I'm happy to go first, Your Honor.  Again,

10  for the record, Craig Newby, Deputy Solicitor General for the

11  State of Nevada representing Secretary Cegavske.

12          We're here before this court on an emergency basis

13  this afternoon as ballots are being counted in Clark County

14  without evidence justifying any, any supportable argument that

15  this lawsuit could succeed on the merits.

16          And I'm going to try to go in the order that

17  plaintiffs addressed their argument.  And what we have first

18  with regards to the -- the public access to vote counting is an

19  issue where one of the plaintiffs, interpreting his declaration

20  in the guise most favorable to him, was denied potentially --

21  it's uncertain whether he was denied less than 90 minutes of

22  observation of ballot counting between the early

23  morning/evening hours of November 4th.  According to his

24  declaration, everyone was told to leave.  And on that basis,

25  plaintiffs seek to impose a nebulous, undefined,

2:20-cv-2046-APG-DJA - November 6, 2020

1   no-further-than-6-feet-away distance, ignoring commonly known

2   CDC requirements on social distancing that we've all been

3   forced to live with, including today in terms of arguing this

4   hearing virtually rather than in person before this Court,

5   without any sort of identification of what the limits are or

6   aren't such that this Court would not be placed in the

7   situation should, hypothetically speaking, Mr. -- plaintiffs'

8   relief and an Evidentiary Hearing is granted and Nevada becomes

9   the epicenter of the universe and we do a re-examination of

10  personal signatures of ballots on mail ballots, over the next

11  week, 2 weeks, 3 weeks, I can't speak to how long, I would have

12  to defer to Clark County and a registrar for precise

13  information on how long that would take, we have daily or

14  perhaps hourly appearances before this Court to resolve can

15  this person stand here, can this person stand there, can

16  that -- does that person (unintelligible) that does this person

17  not require --

18          THE COURT:  I'm not anxious to go back to the days of

19  the hanging chad, if that's what you're getting to.

20          MR. NEWBY:  No, I'm not.  I wasn't going to bring up

21  the hanging chad, but I think what Justice Kavanaugh's

22  concurrence that was referred to during the beginning of this

23  argument, and more generally to the Supreme Court's principle

24  in *Purcell*, expressed in *Purcell* in terms of whether federal

25  district courts should step in and create 11th hour changes to

1  procedures warrants consideration, and that can be more true, I

2  think, in this -- in the context of both the public access

3  issue and this case overall given that right now, following a

4  day-long Evidentiary Hearing that included this plaintiff's

5  counsel, included parties who are equally positioned in terms

6  of their views in terms of how they feel about access for

7  counting, how they feel regarding Clark County's Agilis

8  machine, and all the other issues that are raised in this case

9  before this Court, was adjudicated in a day-long Evidentiary

10  Hearing up in Carson City before Judge Wilson and is currently

11  pending on an expedited basis before the Nevada Supreme Court.

12        THE COURT:  And was that case resolved?  Because you

13  submitted a stipulation, has that been resolved and dismissed

14  or is that still going on?

15        MR. NEWBY:  I'm going to defer to the DNC on that one.

16  I know DNC is a party to that case as an intervenor, and it is

17  my understanding that their position is that they will not sign

18  that stipulation.

19        So I can't speak for them directly.  From what I've

20  heard, they haven't signed it yet and in light of the same case

21  being brought in federal court, I don't know why the Nevada

22  Supreme Court would enforce such a stipulation.  I would think

23  they would want to -- to the extent these Nevada statutory

24  questions need to be adjudicated with regards to the 2020

25  election, I would argue, and I think the Nevada Supreme Court

─────2:20-cv-2046-APG-DJA - November 6, 2020─────

1  would agree, that they are in the best position and the final

2  authority on what Nevada state law is rather than this court,

3  respectfully.  So that's -- I mean, that's a general issue in

4  terms of where we are in terms of this public access.  Nothing

5  defined about it.  And it's not -- it's not the secretary's

6  burden, and it's certainly not Clark County's burden at this

7  hearing to prove -- to disprove the appropriateness of

8  injunctive relief here.  That's plaintiffs' burden.  They have

9  been aware of these issues.  (Unintelligible) regarding these

10  issues.  Yet, here we are with the evidence before this Court,

11  and I submit it's not that much.

12        And, so, I don't have anything further I want to

13  address with regards to the public observation questions other

14  than to note that opposing counsel keeps using the word

15  meaningful.  And it -- I haven't seen a citation to statute

16  that quotes meaningful.  I haven't seen it.  It's not there.

17  And it's asking this Court to write what the statute should

18  mean, to write whether it should be 4 feet away, 6 feet away.

19  Three people in musical chairs, or five people in chairs, or

20  this world during COVID, or not during COVID, and that's --

21  that's the legislature's job and they undertook it when they

22  passed Assembly Bill 4 in the context of COVID this summer.  So

23  if there's no questions on the public observation, I would move

24  on to the -- I guess the Agilis machine arguments pertaining to

25  Ms. Stokke and overall.

2:20-cv-2046-APG-DJA - November 6, 2020

1           THE COURT:  Okay.

2           MR. NEWBY:  Okay.  And I don't want to overdo this,

3    but with regards to the Agilis machine, the issue has been out

4    there for several months.  It has not been a secret.  It is my

5    understanding from the legislative record that's available on

6    videotape that it's no surprise that Clark County, as a large,

7    urban county within Nevada, would use a different system to

8    attempt to verify signatures on mail ballots than one of our

9    more rural counties.  That is part of federalism and being

10   logical and there's a rational basis for that, obviously,

11   because there's a lot more people in Clark County.  And I think

12   this Court -- plaintiffs attempt to address this in part by

13   responding to the DNC argument, but they don't respond to what

14   is set forth in our briefing here today, which, on Page 4,

15   starting at Line 14, which I'm sure the Court has read,

16   there -- there are two adjacent sections of Assembly Bill 4,

17   Section 22(2)(a), which specifically allows a county registrar,

18   such as Clark County, to authorize "mail ballots to be

19   processed and counted by electronic means" followed by Section

20   23, which does not specify that the clerk must do this by hand,

21   that the clerk must do this by his own eyeball, or that the

22   clerk must do this by standing adjacent to a machine, or that

23   the clerk is prohibited from using a machine.  It says nothing

24   of that sort.  It says a fair reading of the adjacent sections

25   of the statute, a plain reading of that, a reasonable reading

2:20-cv-2046-APG-DJA - November 6, 2020

1    of that under these circumstances is, of course a county, if

2    they make that decision, is entitled to do so.  And I'm not

3    going to attempt to revisit on this emergency basis what was

4    addressed by a full-day Evidentiary Hearing in state court in

5    terms of assessing the merits that -- the alleged merits of the

6    Agilis system, Clark County's best positioned to that, but it

7    is a valid system, there is nothing under statute that

8    prohibits it, and there's been nothing proffered here by

9    plaintiffs seeking extraordinary relief demonstrate --

10   providing facts to this Court that the Agilis machine is

11   unreliable.  Instead, what we have is the declaration of

12   Ms. Stokke, who -- who had a mail ballot voted.  It was

13   determined by Mr. Gloria that it was his [sic] signature.  That

14   was the representation of that conversation made by Ms. Stokke.

15   As the Court noted, that was on Page 52 of the declaration that

16   was filed before this.  It was made to an investigator.  It was

17   made -- it was made by a party opponent in this case.  It's an

18   admission by Ms. Stokke that that's -- that's what she was told

19   by Mr. Gloria, that she -- that the signature on file matched.

20   I will leave it to Clark County to determine whether Mr. Gloria

21   actually looked at the signature before telling her it was her

22   signature, but I strongly suspect that is the case.

23          And then her declaration ignores what the Secretary of

24   State's investigator did independently, which is asking for

25   information, asking for something to be declared, and offering

2:20-cv-2046-APG-DJA - November 6, 2020

1    to follow -- follow up with questions and then it was left

2    behind and we get a week later here.  And while I appreciate

3    plaintiffs' effort to disentangle Ms. Stokke's role in

4    justification of timing from their justification for the

5    motion, but if she decided she wasn't going to do something

6    about this and this Agilis machine issue was known and

7    available, then there's no reason in the world why they

8    couldn't have proceeded sooner.  And there's no evidence that

9    there's a missing signature or that the Agilis system failed,

10   and on that basis -- on that non-existent, factual basis they

11   want to shut down the Clark County continued counting the

12   election timely.  It's untimely.  There's no basis for that and

13   there's certainly no basis in fact or evidence or whatever it

14   is that's being discussed about reviewing the other signatures

15   sometime next week.  There's just no basis for it.  There's no

16   one that has asserted standing in this case.  And the standing

17   argument's addressed in more detail by the DNC in their

18   briefing and I'll defer to them on that argument, but the state

19   would certainly submit there's no standing from anyone in this

20   case regarding that -- regarding the Agilis machine and. . .

21   In short, this is their burden.  This is -- this is a

22   serious -- this is a serious matter.  We're talking about the

23   integrity of Nevada's elections and -- and a lawsuit is

24   required in obtaining extraordinary relief, like what's being

25   asked of this Court requires evidence, not just talking points,

——————2:20-cv-2046-APG-DJA - November 6, 2020——————

1   or allegations.  It requires facts, and we don't have any here.

2   And that alone means I should stop, address any questions that

3   the Court has, and if there are none, the Court should deny the

4   motion.

5          Thank you.

6          THE COURT:  I'm just checking my notes to see if

7   you've covered all the questions I had.  Bear with me for just

8   a minute.

9       (Brief pause in proceedings).

10          THE COURT:  Is -- and I don't know if I should address

11   the question to you or Ms. Miller on behalf of Mr. Gloria, this

12   is more of a technical question on the Agilis system, whether

13   -- what's the procedure for verifying a signature with the

14   system and if the system -- if Agilis says it doesn't match, is

15   there a human confirmation of that, how does that all work.  Is

16   that something you can address or is that something for

17   Ms. Miller?

18          MR. NEWBY:  That is something that would be best

19   addressed by Ms. Miller on behalf of Clark County.

20          THE COURT:  All right.  She can thank you for throwing

21   her under the bus on that one.

22          MR. NEWBY:  Not that I'm. . .

23          THE COURT:  All right.  Thank you, Mr. Newby.

24          Ms. Miller.

25          MS. MILLER:  Thank you, Your Honor.

2:20-cv-2046-APG-DJA - November 6, 2020

1          I first have to apologize.  The county isn't open on

2     Fridays for COVID reasons and I was having technical

3     difficulties this morning and it was all I could do to get my

4     Notice of Appearance entered and I consider that a moral

5     victory, but I'm sorry I don't have a formal document on file.

6     If I had more time and this goes to a Preliminary Hearing, I

7     would proffer that this is what are the facts:

8          The statute, N.R.S. 293.- -- 293B.353 says that the

9     Clark County clerk shall -- or the Clark County clerk shall

10    allow members of the public to observe the counting of the

11    ballots as long as they don't interfere with the counting --

12    the counting process.  And in Clark County, we've had that

13    setup for years.  The tabulation room is a big glass enclosed

14    room with plenty of room outside for observers.  They're not

15    6 feet next to them because they'd have to be inside that glass

16    enclosure and cheek by jowl with the tabulation machine

17    operators and that just won't work, even in a non-COVID era,

18    but there's plenty of room outside the windows, and as of

19    2:30 p.m. today, we have not had to turn away any observers for

20    lack of room.  There's easily room for 30, 35 observers.  And

21    they've been there every day that we've been tabulating and no

22    one has complained.

23          What happened with Mr. Prudhome is a little bit

24    different.  He showed up in the middle of the night.  No

25    problem there.  We were tabulating.  Went into the observer's

2:20-cv-2046-APG-DJA - November 6, 2020

1   area.  Wanted to record, and he was told he couldn't record,

2   that was against the statute, only the media were.  He didn't

3   provide his media credentials, but he was shown to the media

4   area, which is not as close as the observers area.  So he went

5   back to the observers area with his recording device and quite

6   frankly the observers weren't having it.  They were getting on

7   his case for trying to game the system and it got contentious

8   and Mr. Prudhome was asked to leave, really, for his own

9   safety.  He is more than welcome back as an observer at any

10  time if he doesn't disrupt the system.

11          With respect to Ms. Stokke, regardless of whether

12  her -- the initial mailed-in ballot in question was read by the

13  Agilis machine, it was her signature, and the signature on the

14  ballot envelope was manually reviewed by Mr. Gloria and two

15  trained supervisors, and in their trained opinion, they believe

16  it to be a match with her signatures on file.  Regardless, if

17  she had been willing to sign an affidavit that she did not vote

18  that ballot and that was not her signature, she would have been

19  given a full provisional ballot, and she chose not to do that.

20  So, the Agilis machine did not have any -- any involvement in

21  what happened to Ms.- --  Ms. Stokke at all because she -- she

22  did get her ballot envelope signature reviewed by three trained

23  supervisors, and it more that meets with the statutory

24  requirements for met -- for reviewing signatures.

25          I would point out that AB 4 does not require a manual

2:20-cv-2046-APG-DJA - November 6, 2020

1   review of the signatures.  It does say that the Registrar of

2   Voters shall review the signatures, but it doesn't say it can't

3   be done electronically, and, in fact, AB 4 says it -- ballots

4   can be processed and counted electronically.  What the Agilis

5   machine does, in Clark County, are three different actions:

6           First, the ballot envelopes are run through there.

7   The signatures are captured electronically and put into the

8   Clark County system, and there's a tracking device so that we

9   can acknowledge and track that we've got this ballot in our --

10  in our office as in it's been read by the Agilis machine.

11          It goes through a second time to see if the quality of

12  the signature in our database provides a match to the signature

13  on the envelope, and that happens about 30 percent of the time.

14  And if it doesn't match by the Agilis machine, those are all

15  reviewed by non- -- bipartisan panel's signature verifiers

16  manually looking at the ballot envelopes to the ballot

17  signatures that we have on file.  So that's a more

18  time-consuming process just because you have to pull up all the

19  files.

20          And then the third -- and then the ballot envelopes

21  are run through the Agilis machine a third time to make sure

22  that they've been accurately numbered and tracked and those

23  signatures -- those ballot envelopes are tracked through our

24  system until the envelopes are separated from the ballots.

25          So I just --

2:20-cv-2046-APG-DJA - November 6, 2020

1           THE COURT:  Hang on.  Let me ask you to pause there
2    for a second.
3           MS. MILLER:  Sure.
4           THE COURT:  I want to make sure my notes are accurate
5    on what you've just described.  Give me a second here.
6       (Brief pause in proceedings).
7           THE COURT:  So, on this sort of second phase, you're
8    running through a second time to see if the quality of the
9    signature in your database matches the signature on the
10   envelope and you said that happens about 30 percent of the
11   time.  What happens 30 percent of the time, 30 percent of them
12   are run through that test or it says 30 percent of them don't
13   work --
14          MS. MILLER:  No.
15          THE COURT:  -- don't match?
16          MS. MILLER:  30 percent of them are a match, the
17   quality of the signature on the envelope and the quality of the
18   signature in our database match up so that this -- this
19   machine, which is similar to machines that are used in banks to
20   verify signatures, say that the signature on the envelope and
21   the signature in our ballot -- in our database matches.
22          THE COURT:  Okay.  So, if the 70 percent then don't
23   match, those 70 percent then are hand reviewed?
24          MS. MILLER:  That's correct.
25          THE COURT:  Okay.  I'm with you.  I apologize for

―――2:20-cv-2046-APG-DJA - November 6, 2020―――

1   interrupting you.  Go ahead now.  Thank you.

2            MS. MILLER:  I just don't see, given those facts --

3   and those facts were all put into evidence at the earlier

4   hearing about the Agilis machine -- that these plaintiffs have

5   shown that they have had any harm related to the Registrar of

6   Voters viewing policy at the tabulation center or the use of

7   the Agilis machine.  They just haven't established a harm to

8   them, and certainly not the candidates who are plaintiffs.

9            THE COURT:  All right.  Anything further?

10           MS. MILLER:  I just would join into the responses of

11  both the Secretary of State and the intervenors for the record.

12           THE COURT:  Okay.  Let me ask you a factual question,

13  if I can.  Bear with me here.

14      (Brief pause in proceedings).

15           THE COURT:  I apologize.  Just bear with me here.  I'm

16  looking at my notes and some papers.

17      (Brief pause in proceedings).

18           THE COURT:  Okay.  Yeah.  I'm looking at state

19  district George -- I'm sorry, state district Judge Wilson's

20  findings and conclusions in the *Kraus vs. Cegavske* case dated

21  October 29th, on Page 4, he said that Registrar Gloria opined

22  in that case that if Clark County could not continue using

23  Agilis, the county could not meet the canvass deadline which is

24  November 15th, and Judge Wilson found that if Clark County's

25  not allowed to continue using it, the county will not meet the

1    canvass deadline.

2           Do you agree with that finding by Judge Wilson?

3           MS. MILLER:  That was an accurate finding based on the

4    information he was given then in testimony last week.

5    Obviously, a lot of those ballot envelopes have been read

6    between last Wednesday and today, but we still do have 63,000

7    that we're processing.  241 more ballots came in the mail

8    today.  They have a few more days to get ballots -- ballots to

9    come in the mail, so the effect -- to be frank with the Court

10   as I have a duty to, the effect wouldn't be as catastrophic if

11   you entered it today, but it would still delay our processing.

12          THE COURT:  So you said you still have, you believe,

13   approximately 67- -- 63,000 ballots that still have to be

14   counted in Clark County?

15          MS. MILLER:  That still have to be processed before

16   they can be counted, yes.

17          THE COURT:  Oh, okay.

18          MS. MILLER:  Those are mail ballots.  There's some

19   other electronic ballots, but I think we're only talking about

20   mail ballots for this purpose.

21          THE COURT:  Okay.

22          All right.  Thank you, Ms. Miller.  I interrupted you.

23   Anything further?

24          MS. MILLER:  No -- no, Your Honor.

25          THE COURT:  Thank you.

—2:20-cv-2046-APG-DJA - November 6, 2020—

1          Let me turn to Mr. Bravo or one of your co-counsel on
2     behalf of the DNC.
3          MR. DEVANEY:  Your Honor, this is John Devaney, I'll
4     be speaking for the DNC with the Court's permission.
5          THE COURT:  Absolutely.
6          MR. DEVANEY:  Thank you, Your Honor.  I think I'll
7     begin by answering the question that you posed and I've been
8     reluctant to jump in and interfere, but the state court action
9     is continuing, so just to be very clear about that.  It's still
10    pending in the Supreme Court of Nevada.  The
11    plaintiffs/appellants in that case just yesterday requested for
12    a briefing schedule, a postponement for the briefing schedule
13    that has briefs due approximately a week from now, and the case
14    is not resolved.  We expect that that case will proceed and
15    those state law issues remain before the Supreme Court of
16    Nevada.
17         THE COURT:  So I've got this stip- -- I've got the
18    stipulation and order for dismissal that's signed at least by
19    Ms. Miller and the attorney for the petitioners in that case,
20    obviously your client hasn't signed off on it and I don't see
21    Secretary of State's Cegavske's signature on it.  Are you
22    saying that stipulation didn't go forward?
23         MS. MILLER:  It did not include a signature from our
24    client, the DNC, or the Nevada Democratic state party and, so,
25    as of this juncture it remains pending and our expectation is

1   that we'll go ahead and brief that appeal and present those

2   issues of state law to the Supreme Court.

3           THE COURT:  Okay.  Go ahead.  I interrupted you.

4           MR. DEVANEY:  And, Your Honor, of course that has a

5   direct bearing on the issues before you.  I'm sure the Court is

6   well aware of the Truman Doctrine and Pullman abstention and

7   that doctrine, of course, establishes that when resolution of a

8   question of state law by a state court will resolve a matter

9   pending before a federal court, the federal court should

10  abstain.  And the issues teed up in the Supreme Court

11  proceeding bear directly on the issues before Your Honor.  They

12  involve, one's the lawfulness of using Agilis and the

13  discretion of the registrar to use that machine, and two, the

14  extent to which a county, in this case Clark County, is

15  required to provide public observation of the counting of

16  ballots.  And those statutes -- state statutory questions are

17  before the court, the Supreme Court that is, and therefore

18  Pullman applies with full force in this instance.  So I just

19  thought I'd begin with that, Your Honor, since you had asked

20  about where that state court proceeding stands.

21          THE COURT:  Thank you.  I appreciate that.

22          MR. DEVANEY:  And, Your Honor, I don't want to belabor

23  the points that have been made already, but there are a few

24  points that I really do want to emphasize.  One is just the

25  extraordinary context of this case.

1           The Agilis system was used in the June primary.  It's

2    public knowledge that this system has been used.  As

3    Judge Wilson found, this system is used by multiple

4    jurisdictions around the country, including very large cities

5    around the country.  It's been proven to be reliable.  And

6    people in Nevada have known, including plaintiffs' counsel,

7    that this machine has been in use for many months in Nevada,

8    and that it would be used in this election.  And, you know,

9    here we are now, it is literally 2 days after election that

10   they filed their complaint -- 2 days after Election Day,

11   knowing for months that this system was being used and coming

12   in and asking the Court to stop use of the system.  You know,

13   one -- one can just hear that story and understand the equities

14   that -- the equitable problems that raises.  It cries out for

15   laches.  It cries out for equitable estoppel.  And the

16   disruption that would be created by stopping the use of this

17   machine, when, as Ms. Miller just mentioned, there's still

18   62,000, approximately, ballots that need to be processed.  And

19   literally the whole country is looking at Nevada, and

20   Clark County in particular, and waiting for the election

21   results.  And I don't know exactly how much delay would be

22   (unintelligible) from Agilis, but I know from the evidentiary

23   proceeding we had last week that it would be meaningful, it

24   would probably be days and days.  I don't know if it would

25   compromise the canvassing deadline now, but there certainly

2:20-cv-2046-APG-DJA - November 6, 2020

1    would be delay, and it would create chaos and confusion.  And

2    given the timing of this, where plaintiffs' counsel at least,

3    have known about the use of Agilis for months, it's just

4    extraordinary that they'd come in and even ask for this relief

5    knowing the chaos that would result from it.  So I just wanted

6    to emphasize that very important context as we consider the

7    legal arguments that -- the claims that are before you.

8           And also then relatedly, it's just the fundamental

9    lack of evidence, the -- let's just pause for a moment and

10   think about what evidence is before you that would cause the

11   Court to stop the use of Agilis.  It is a single declaration

12   from a single voter who doesn't even know if Agilis affected

13   her ability to vote.  That's not established anywhere.  And

14   we've heard the facts relating to her attempt to vote, which

15   are quite different from what were represented initially, where

16   she was given a chance to vote, she was given a chance to

17   submit a provisional ballot and she refused that opportunity

18   and it's just extraordinary that you would be asked to take the

19   leap from that flawed affidavit, the declaration, to shutting

20   down Agilis altogether and stopping, essentially, the counting

21   or processing of ballots in Clark County while the whole

22   country looks on.  It's really just a remarkable leap that

23   you're being asked to make.

24          In addition to those problems, Your Honor, there is a

25   fundamental standing problem here.  And you've read our briefs

2:20-cv-2046-APG-DJA - November 6, 2020

1    and I'm mindful of your comment earlier that we shouldn't
2    repeat what's in our briefs, but I do just want to briefly
3    emphasize that their theory here is vote dilution, that the
4    Agilis machine somehow causes more wrongful rejection of
5    ballots in Clark County than elsewhere in the state.  First of
6    all, there's no proof of that.  That's number one.  But even if
7    there were vote dilution, it's well-established by the case law
8    cited in our brief, it's not a basis for standing.  It's a form
9    of alleged harm that affects everybody in the state equally.
10   If there's dilution, then everybody's vote is diluted equally
11   across the state.  And, so, that's why courts have consistently
12   found that a vote dilution based on fraud theory is
13   insufficient to confer standing and multiple cases have
14   resulted in courts finding a complete lack of standing based on
15   a vote dilution theory.
16           And then, Your Honor, the second standing problem that
17   plaintiffs have relates to their claim under the elections
18   clause.  As I understand it, they're claiming that the use of
19   Agilis and perhaps even the registrar's decision on observation
20   somehow violates the legislative demands in Nevada and that the
21   registrar is usurping the authority of the legislature by
22   administering the election in this way.  And, again,
23   Your Honor, there's significant case law establishing that --
24   that there is no standing, that they cannot stand in the shoes
25   of the legislature.  It's only the legislature that would have

1    standing to come in and claim that their power is being

2    usurped.  Certainly these plaintiffs do not have that

3    authority, and I cite the Court to *Corman v. Torres* which makes

4    that proposition clear, as does *Lance v. Coffman,* a Supreme

5    Court case, and the standing deficiencies aren't remedied by

6    tacking on the two committee candidates as parties.  The

7    pleadings don't even allege any harm to those committees, so,

8    in addition to the -- the equitable problems they have that I

9    started off with, there is a fundamental standing problem that

10   exists in this case.

11          And then, Your Honor, that takes me to the merits,

12   which other counsel have addressed and I don't -- I will not

13   spend a lot of time on the merits, but I will respond to the

14   suggestion from plaintiffs' counsel that the DNC somehow

15   misrepresented to the Court the statutory scheme relating to

16   use of electronic technology in processing ballots.  The

17   language is very clear.  It says that electronic technology can

18   be used, and that's not inconsistent with elsewhere in the

19   statute where it says the clerks shall -- shall review ballots.

20   It doesn't mean that clerks can't rely on electronic

21   technology, as Judge Wilson found, and then as we've talked

22   about, Judge Wilson found that technology is completely

23   reliable and used in a standard way by multiple jurisdictions

24   around the country.

25          Your Honor, just a couple more points, and that is

2:20-cv-2046-APG-DJA - November 6, 2020

1    that on the observation claim, Your Honor alluded to it, but

2    it's absolutely right that the time, place, and manner of

3    conducting elections is within the jurisdiction of election

4    officials and the legislature and the court -- a court should

5    not get into micromanaging how -- where people stand, what

6    machines are used to process ballots, and that's what you're

7    being asked to do.  And it really does get into a separation of

8    powers issue, and time, place, and manner is exclusively within

9    the jurisdiction of the legislature and registrars, you know,

10   unless there is a constitutional violation, and there's nothing

11   here that's close to a constitutional violation.  So, I just

12   wanted to reiterate that point.

13          And then, finally, Your Honor, I'll just conclude with

14   the equitable considerations that bar relief because I just

15   think they're so compelling and important.  One is they sat on

16   their claims; two, it's against the public interest to just

17   disrupt the processing now; three, the plaintiffs are able to

18   observe, so you (unintelligible) to the parties, they are able

19   to observe.  The delay in reporting results is significant.

20   It's a -- it's not just a Nevada interest, it's a national

21   interest.  And last, this claim, just like the claim that

22   Judge Wilson considered, is singling out Clark County, it's

23   treating Clark County disparately from other counties in the

24   state.  There's no -- we don't see the Trump campaign or other

25   parties going into counties other than Clark to ask about

———2:20-cv-2046-APG-DJA - November 6, 2020———

1   observation, to redress observation, and that's just another

2   equitable fact is the disparate treatment that's being imposed

3   on Clark that I would ask the Court to consider.

4           Your Honor, there's more I'd say, but I think it's

5   covered in our briefs and it's been covered by the other

6   parties, so I'll stop now and, of course, entertain any

7   questions you might have.

8           THE COURT:  Given that brevity is the soul of wit,

9   Mr. Devaney, I appreciate your comment.

10          MR. DEVANEY:  Thank you.

11          THE COURT:  Let me turn back to Mr. O'Mara, since it's

12  your motion, you get the rebuttal.  Address for me, if you

13  would, first off, this argument of Pullman abstention.  If the

14  Supreme Court of Nevada currently has this case pending in

15  front of it addressing these various issues, why should I wade

16  into their pool?

17          Mr. O'Mara?

18          Uh-oh.  Let's go off the record for a second and see

19  if we can. . . is he on there?

20          Off the record for a technical standpoint.  Let's see

21  if we can get Mr. O'Mara.

22          MR. O'MARA:  Okay.  Is that me?

23          THE COURT:  Okay.  All right.  Back on the record.  We

24  got you.  Thank you.

25          MR. O'MARA:  Sorry.

2:20-cv-2046-APG-DJA - November 6, 2020

1          THE COURT:  Back on the record.

2          That's okay.  No worries.

3          MR. O'MARA:  So, Your Honor, the argument about the

4   fact that the Supreme Court is getting -- addressed this issue

5   is not likely to happen because the parties to the issue have

6   moved and are trying to dismiss (unintelligible) DNC's ability

7   or their not wanting to sign an agreement takes that into

8   effect, but also this is a TPO.  We're asking for the Court for

9   the relief to review the statute and, so, to me, the issue, if

10  you look at the Nevada Supreme Court, the briefing is not going

11  to be until next week, the likelihood is that the votes will

12  already be counted, the Agilis machine will have already been

13  used and therefore extraordinary relief is necessary for this

14  Court because it's not going to be able to defer to the Nevada

15  Supreme Court.  So, with that in mind, the Court needs to

16  protect the integrity of this election to provide for Nevadans

17  and with all due respect to the rest of the country, this is a

18  Nevada election and it needs to be followed by Nevada law.

19          And secondly --

20          THE COURT:  So shouldn't -- no, but shouldn't that be

21  decided by Nevada justices elected by Nevada residents?  Why

22  should I, a federal judge, wade into the Nevada elected

23  justices dealing with state election law?

24          MR. O'MARA:  Because the -- the issue is in front of

25  you today and it will not be addressed by Nevada state law, and

1    it needs to be addressed in an expedited manner so the vote is

2    protected moving forward.

3         THE COURT:  So shouldn't you address that to the

4    Supreme Court of Nevada and ask them to expedite their hearing?

5         MR. O'MARA:  Well, Your Honor, that is a separate

6    case.  We have separate harm in this case with the client.  So,

7    my clients do not have the right to expedite this issue to the

8    Nevada Supreme Court.  My client has been harmed.  And contrary

9    to what the DNC says, this is not a voter dilution case.

10        I'm sorry, is someone not muted?  I'm hearing a lot of

11   background.

12        THE COURT:  Yeah.  No, I agree.  Let me ask again,

13   everyone on the line, please mute your phone and microphone and

14   we are getting a little interruption here.  Again, whether

15   you're on the telephone or some other access, please mute your

16   phone and microphone.

17        Thank you, Mr. O'Mara, I apologize for that.

18        MR. O'MARA:  I'm sorry.

19        So, this is -- my clients have been -- just my client

20   in regards to Ms. Stokke, has been disenfranchised by the use

21   of a machine that is improperly done and we don't have the

22   ability to move forward in the Supreme Court.  She needs relief

23   now, relief to show that that machine should not be working so

24   that no other disenfranchisement is handled.

25        Now, in regards to the standing, we have -- she

——————2:20-cv-2046-APG-DJA - November 6, 2020——————

1   actually has actual injury.  She wasn't -- what Ms. -- what

2   Ms. Miller said today was that Mr. Gloria and two of his

3   employees looked over the machine.  Okay.  And that -- the

4   only -- know that that happened was after my client went to the

5   board -- to Mr. Gloria and said this vote is stolen; it's not

6   mine because you're -- again, I hear some muting.

7           THE COURT:  Again, please mute your phones.  We're

8   having a little bit of interruption.

9           Go ahead, Mr. O'Mara.

10      (Court reporter interruption).

11          THE COURT:  So, Mr. O'Mara, again, if you'll get

12  closer to the phone and I'm going to ask everyone to mute their

13  phones.

14          Go ahead.

15          MR. O'MARA:  So, we look at the situation and we

16  don't -- we don't have, as a normal Nevada law, you know, would

17  have it.  We have a situation here where there is a -- we don't

18  have the opportunity to do that.  Our client --

19      (Court reporter interruption).

20          THE COURT:  Mr. O'Mara, are you on a speaker phone?

21          MR. O'MARA:  I'm on a Zoom, Your Honor, so it's --

22          THE COURT:  Okay.  Go ahead.  Yeah.

23          Go ahead.

24          MR. O'MARA:  So, my client has been harmed.  She has

25  equal protection grounds.  This hasn't been a dilution -- well,

1  there is standing on equal protection grounds if there is a --

2  been a dilution or debasement of voting.  What we have, a

3  situation where Ms. Miller talks about Mr. Gloria only

4  reviewing the -- or I'm going to infer that since she didn't

5  say that Mr. Gloria had (unintelligible) already reviewed the

6  ballot signature that they went over it again with my client,

7  we believe it was the first time that Mr. Gloria, after the

8  vote had already been taken, after Mr. Gloria says, oh, you

9  know, your vote -- if you claim that your vote has been taken,

10  you can have a secondary -- we will treat you secondary and

11  give you a provisional ballot and you don't get the opportunity

12  to do your vote.  She's been -- she's been harmed.  She

13  deserves recourse.

14          THE COURT:  Why -- wait.  Okay.  Let me address -- let

15  me address that directly because that -- I'm still, I guess,

16  having a hard time understanding your argument.  If -- if --

17  assume that everything your client is saying is correct, that

18  her -- somebody else turned in her ballot for her --

19          MR. O'MARA:  Um-hmm.

20          THE COURT:  -- and Mr. Gloria said we'll let you vote

21  again and we will count your new vote, it's a provisional.  If

22  we can prove that your original vote is fraud or false or not

23  your signature, we'll invalidate that one and we will let your

24  vote count.  Why doesn't that cure the problem?

25          MR. O'MARA:  Well, it doesn't let her vote, first of

1  all, because there is a ballot out there that has fraudulently

2  been filed and --

3       THE COURT:  But if they invalidate that ballot and let

4  your client vote, doesn't that cure the problem?  Because

5  otherwise, there's never a remedy to fix it, you're saying.

6       MR. O'MARA:  Well, Your Honor, there is -- there is no

7  evidence to show that the Registrar of Voters can go back in

8  and find the vote and say this one has been canceled out.

9       THE COURT:  Okay.  So let's say -- so let's say they

10  can't.  Then we allow your client to vote.  If this vote comes

11  down to one vote, then we may have an issue, but if there's a

12  fraudulent vote hanging out there and your client -- okay.  I

13  understand what your argument, sort of, but I guess I'm not

14  sure, factually, whether what you're saying is correct or not.

15       MR. O'MARA:  My client, Your Honor, is entitled to the

16  same rights as every other American and every other Nevadan and

17  then that is the right to vote their ballot and have their

18  ballot counted.  And when we have a system that is put into

19  place where it is contrary to Nevada law, it is contrary to the

20  provisions throughout the state and she loses her ballot, she

21  is harmed and that is really terrible, unfortunate, and not the

22  American way, nor is it Nevada.

23       Now, the Democratic party says, oh, we're only going

24  after Clark County.  Well, the reason why you're only going

25  after Clark County is because every other county eyeballed and

———2:20-cv-2046-APG-DJA - November 6, 2020———

1    did it appropriately through the statute.  Okay.  They didn't
2    have the right to do this.  And if you look at what the
3    legislature's declaration of voter rights is, under N.R.S.
4    293.2546, it specifically says that the legislature hereby
5    declares that each voter has the right to have a uniform
6    statewide standard for counting and recounting all votes
7    accurately, and that's exactly what happened when you look at
8    the statutes.  I mean, we look at mail ballots and people are
9    always saying mail ballots, absentee ballots, they're all the
10   same in regards to how you -- well, how you go about doing the
11   verification.  You have to have the clerk look at it and say
12   this is valid.  To say that you can read into the statute of
13   N.R.S. -- of the statute and say that the clerk or employee
14   shall check the signature -- but they don't actually have to
15   check it, they can use a machine -- against all other
16   signatures, that's an absurd result, especially when you look
17   at N.R.S. (unintelligible) Subsection 1.  It says except as
18   provided in provision -- in N.R.S. 293D.200.  That's not the
19   section before it.  If the legislature truly wanted to, they
20   would have said, you know, except as otherwise provided in
21   N.R.S. 293.8871(2)(a) that the clerk and employee has it [sic].
22   It specifically says, under the statute of 293.8871, while
23   there is a mechanism for the process and counting by electronic
24   means, it also says, "and must not conflict with provisions of
25   N.R.S. 293.8801 to 293.8887."  So you look at the next --

1          THE COURT:  Except -- I get the -- I get the argument.

2   I get the argument.  Isn't the reverse argument to that,

3   though, that the legislature wanted to, they could have said it

4   has to be checked by eyeball or by finger or by Braille or by

5   some mechanical method and the fact is, they wrote it the way

6   they wrote it and they added the statute that said they can do

7   that by electronic mail -- by electronic means in the other

8   statute.  I mean, at some point --

9          MR. O'MARA:  No -- no, Your Honor, because they

10  quantify it and qualify it by saying that the next -- in the

11  next section, it says must not conflict with provisions of

12  N.R.S. 293.8801.  It's a conflict.

13         When you look at the statutory language, it says

14  duties of clerk upon return of mail ballots.  Procedure for

15  checking signature.  Now, it sets forth (a) and (b).  So if you

16  don't do (a), you can't get to (b).  So, that's -- you can't

17  come up and have a reasonable argument that says that.  You

18  know, they -- and, so, you move forward and -- and the statute

19  is very clear.

20         Now, the second thing is that they talk about, like,

21  Judge -- Judge Wilson's argument.  Well, we didn't know that

22  there was a harm.  That was one of the things that the judge

23  looked at.  We now know that there is a harm, and that's -- and

24  we have a harm.  We have -- we have a person that was not

25  entitled to vote.  And, so, there's a different analysis in

2:20-cv-2046-APG-DJA - November 6, 2020

1  this case than there is on the other one.

2          Additionally, what we're asking for is a TPO.

3  Ms. Miller has contested -- or has stated that if you do just

4  set these aside for these last ones until we can come back in

5  here and show other information and other evidence and go

6  through the Agilis machine, and send a 5-year Agilis machine

7  [sic], it may be delayed, but they will still be able to get to

8  it.  And it is more important for Nevada to do it right than it

9  is for Nevada to do it fast.  That is exactly what Mr. Gloria

10  has been saying throughout the whole entire process, why he's

11  been -- why there has been delays.  It is to do it properly and

12  not to do it fast.  So, if we're going to do it properly and

13  we're going to take the situation where we're going to look at

14  the situation, they -- there is no harm to them -- to the

15  Registrar of Voters except for a little bit of time to set

16  aside the Agilis machine and eyeball -- eyeball and look at it

17  and have a clerk or an employee look at it first and then move

18  forward.

19          And when you look at whether or not there's -- the

20  legislature says this, look at all the other counties in

21  Nevada.  Only Clark County said we're going to go ahead and do

22  this.  Now, if Clark County would have wanted to make sure that

23  they had this Agilis machine, they -- the legislature could

24  have put in there, specifically, that we no longer care that

25  there's uniform standards and Clark County can do whatever they

1   want and have a machine or whatever they want and then

2   everybody else has to do it the right way and under the

3   statute, but -- excuse me, not the right way, but under the

4   statute in that regard.  So --

5           THE COURT:  Well, isn't -- isn't -- isn't that implied

6   in 293.871(1) that says, "The county or city clerk, as

7   applicable, shall establish procedures to the processing and

8   counting of mail ballots"?  Doesn't that give to each county

9   the right to do what they think is best and then get it blessed

10  by the Secretary of State?  So the legislature presumed there

11  might be different systems used; right?

12          MR. O'MARA:  Well, here -- here's the thing,

13  Your Honor.  You make -- you bring up a good point.  You talk

14  about how the Secretary of State has to approve and put it as a

15  blessing, but the Nevada legislature -- or the Nevada Supreme

16  Court has consistently held that oral -- oral consent of the

17  Secretary of State is not proper.  If you look at *Kelly vs.*

18  *Murphy*, 79- --

19          THE COURT:  Wait.  Wait.  Wait.  Whoa.  Whoa.  That's

20  not your brief.  That's way far afield of what we're here on

21  today and -- and that's really getting into a Pullman issue.

22  You know, we're here on the allegations in your motion and that

23  is Ms. Stokke and Mr. Prudhome.

24          MR. O'MARA:  Right.

25          THE COURT:  And. . .

—2:20-cv-2046-APG-DJA - November 6, 2020—

1          MR. O'MARA:  Exactly, but it goes towards the

2     provisions, Your Honor, and you were talking about -- and you

3     were saying that it has to have the blessing of the Nevada --

4     of the Secretary of State and I'm telling you, what I'm saying

5     is that Nevada law was that the Secretary of State cannot just

6     give oral communications, they have to promulgate regulations.

7     And if they don't do that, then the oral communication and

8     actions are a futile act undertaken within -- without lawful

9     authorization.

10          So we have --

11          THE COURT:  Well, let me -- let me ask you to follow

12     up on that then because looking at the statute, the plain

13     language of the statute makes no reference to the Secretary of

14     State.  It just says, "For any elected -- any affected

15     election, the county or city clerk, as applicable, shall

16     establish procedures for the processing and counting of mail

17     ballots."

18          MR. O'MARA:  Right.

19          THE COURT:  Doesn't even have to be approved by the

20     Secretary of State, apparently.

21          MR. O'MARA:  Well, and that is -- and then you can

22     read that, but you have to also look at Subsection 2, which

23     says that they are only to establish those procedures if they

24     do not conflict with the other provisions.  And --

25          THE COURT:  Okay.

─────2:20-cv-2046-APG-DJA - November 6, 2020─────

1        MR. O'MARA:  -- the other provisions are clerk or

2   employee.  If they wanted -- they could have just said clerk or

3   employee or any mechanical device or -- but it doesn't.  It

4   specifically says "clerk or employee shall."  It doesn't say

5   may.  It doesn't say may, the clerk or employee may check.  It

6   says they have -- they shall check.

7        THE COURT:  Okay.  Let me ask you this then:  Under

8   293.881(1) it talks about having to count, the mail ballot

9   central counting board, they have to count.  It doesn't say how

10  they count it.  Does that mean they have to count them all by

11  hand?  Are they allowed to use a calculator?  Are they allowed

12  to use a machine to count?  It doesn't say --

13       MR. O'MARA:  There's no procedure or policy that

14  conflicts with what the -- what the Agilis machine is.  Okay.

15  So, there's nothing in there that says this is how they have to

16  count the ballots.  It says that they have to count them.  And,

17  so, they may authorize ballots to be processed and counted by

18  (unintelligible) election means.

19       Now, for example, when Ms. Miller talks about

20  Subsection 1, or Section 1 of the Agilis machine first, she

21  runs it through and they do something with it, that's a

22  processing.  But when they do the second one, that one is

23  outside of the realm of what the Agilis machine can be used

24  for.  It cannot be used for the verification because the

25  verifications without a clerk or an employee.  So therefore you

2:20-cv-2046-APG-DJA - November 6, 2020

1  can -- you can run it through to make sure that that person is

2  no longer going to vote, which is exactly what happened, we

3  believe, with my client, it ran through the system, it clicked

4  her off so she couldn't go in and vote.  Then it comes back,

5  then they run it through improperly because the next statute

6  requires that a clerk or employee shall check the signature.

7  There's nothing -- there's no evidence to show that there's no

8  clerk checking that signature at that time, and the Agilis

9  machine spits out 30 percent of them saying I've checked it,

10  not a clerk or an employee.  The Agilis machine.  Not the clerk

11  or the employee.  And then the third one, if you go to the

12  counting of the ballots in that regard.  So --

13            THE COURT:  Yeah, I -- I get the argument.  We're all

14  repeating ourselves now.  I understand the argument.

15            MR. O'MARA:  Okay.  As to proven reliable, we already

16  know that -- we're obviously saying something different, which

17  was not available at the time of Judge Wilson's decision.

18  Ms. Stokke didn't have -- didn't know about her ballot really

19  until at least October 29th when she went back in to

20  Mr. Gloria.  So there was obviously no time to bring that up to

21  Judge Wilson's ability to make his decision on that date.

22            Sorry, Your Honor, let me just scan my notes a minute.

23            THE COURT:  Yep.

24       (Brief pause in proceedings).

25            MR. O'MARA:  Also, Your Honor, where are -- there are

Heather K. Newman, RPR, RMR, CRR, CCR #774

2:20-cv-2046-APG-DJA - November 6, 2020

1    no policies and procedures as to the Agilis machine.  There

2    hasn't been anything established.  What it has been is a

3    definite unilateral decision by the Registrar of Voters to

4    implement a system.  There's no policies and procedures.

5    There's nothing that saying he's going to do this, these are

6    the steps that we're going to take.  He just basically says I'm

7    going to do this.  No policies and procedures of the Agilis

8    machine.  So, he himself has not set policies and procedures to

9    allow the Agilis machine and therefore, again, it's a futile

10   act under the (unintelligible) system that's unlawful and

11   therefore you can't -- you got to have everything in writing.

12   You got to have the policies and procedures in place.

13            The lach- -- I think the laches, do you need me to go

14   into more of the laches, Your Honor?

15            THE COURT:  No.  No.  No.  No.  I was just throwing

16   that out there as an example.  I'm not relying upon laches.

17            MR. O'MARA:  Like I said, Your Honor, today, you know,

18   we're asking the Court, and Ms. Miller has said that the

19   stopping the Agilis machine will have very little harm to

20   the -- to Registrar of Voters, we're asking for you to set that

21   aside for the weekend or until Monday or Tuesday to allow

22   people to further brief and present in an Evidentiary Hearing

23   on Tuesday and all ballots should go through the legally

24   required process for digital verification and once they go

25   through that verified visual verification, we're not asking for

1   the ballots to be stopped and uncounted, but we are asking for

2   the Agilis machine to be not used over the next few days until

3   the Court can have an Evidentiary Hearing.

4          We are asking that you segregate all ballots that have

5   been counted by the Agilis machine previously so that if the

6   Court does issue a ruling on a TPO, or on the injunctive relief

7   after an Evidentiary Hearing, those ballots can already be

8   ready to go so that they can be visually verified without

9   delay.  Like I said, we're not asking them to count -- stop

10  counting.  And we need to have uniform standards where every

11  county, it's the same.

12         And, so, we ask you to enter, as I presented in the

13  opening, a plan for observation as well as what I just talked

14  about, about the Agilis machine.

15         Thank you, Your Honor.

16         THE COURT:  Thank you, Mr. O'Mara.

17         Let me -- let me just backtrack for just a second to

18  Ms. Miller, and if you don't know the answer to this, I

19  appreciate that, but let me ask you, because I asked this or

20  suggested this to Mr. O'Mara, and that is that, if, in fact,

21  it's determined that Ms. Stokke's original ballot that she

22  claims was fraudulently submitted was, in fact, a fraud, is

23  there a way to cancel that ballot out?

24         MS. MILLER:  Probably not at this time.  Maybe when

25  she first complained about it, it -- it could have been

———2:20-cv-2046-APG-DJA - November 6, 2020———

1   segregated, but once the ballot envelope is separated from the

2   ballots, you can't go back and take it out of the pool for that

3   reason.  But she could have gone ahead, acknowledged by

4   affidavit that it was not hers and that she did not vote the

5   ballot and she would have given -- been given a provisional

6   ballot, a full provisional ballot.  So, it's really not any

7   different than if somebody went up to in-person voting and

8   forged her signature on the sign-in in such a fashion that the

9   poll worker said, yeah, that's good enough, go vote.  Once that

10  vote gets into the system, we can't pull it back out, but she

11  could have, either when talking with Mr. Gloria or at in-person

12  voting, said, I'll sign the affidavit, let me vote.  And she

13  chose not to do that.  And she hasn't established that it was

14  the Agilis machine rather than somebody committing fraud upon

15  her that caused her harm.

16          THE COURT:  So -- so just to follow up and be clear.

17  If I walk up to the polling headquarters and say I want to vote

18  and they show me the book and say sign here and it's got

19  somebody else's signature on my spot and I show them that's not

20  my signature and somebody apparently voted in my place, the

21  poll worker there could verify that signature isn't correct and

22  I would be given a new ballot and I could vote that ballot?

23          MS. MILLER:  If you signed an affidavit saying it

24  wasn't your signature --

25          THE COURT:  Correct, yes.

2:20-cv-2046-APG-DJA - November 6, 2020

1           MS. MILLER:  -- and that you had not voted yet, yes.

2           THE COURT:  And Ms. Stokke, in your opinion, since you

3   raised the issue, if she would have signed an affidavit that

4   says this is -- the original ballot was not mine, they would

5   have given her a ballot and she could have signed that, or she

6   could have voted on that ballot?

7           MS. MILLER:  Yes.

8           THE COURT:  Okay.  Thank you.

9       (Brief pause in proceedings).

10          THE COURT:  All right.  Here's my decision.

11          As I mentioned earlier, I take into account

12  Justice Kavanaugh and his concurrence in the *Democratic*

13  *National Committee vs. Wisconsin State Legislature* case.  His

14  concurrence on October 22nd of 2020 strongly suggests that

15  district court judges like me should not interfere with state

16  election proceedings unless there are. . . significant, I'll

17  call it, reasons to.  I won't repeat the quotes I put on the

18  record earlier, but I incorporate them here.  The notion being

19  that it's for the state legislature to write state election

20  laws and I should not usurp that proper role of state

21  legislatures and rewrite state election laws.

22          In determining whether to enter a Temporary

23  Restraining Order, or Preliminary Injunction, I'm guided by the

24  four-factor test that's set forth in the Supreme Court's

25  decision of *Winter vs. Natural Resources Defense Council, Inc.*,

———2:20-cv-2046-APG-DJA - November 6, 2020———

1    which is at 555 U.S. 7, at Page 20, it's a 2008 case.  There

2    are four factors:

3         One, a likelihood of success on the merits; two, a

4    likelihood of irreparable harm; three, the balance of hardships

5    favors the plaintiff; and four, an injunction is in the public

6    interest.  And it's the plaintiff seeking a motion for -- or

7    seeking a Temporary Restraining Order that has the burden of

8    demonstrating those.

9         In addition, when the plaintiff seeks a mandatory

10   injunction, that is, an injunction that requires affirmative

11   conduct, that means forcing the defendant to do something

12   different as opposed to just stopping them from doing

13   something, that standard is even higher because those requests

14   are subject to heightened scrutiny, and the Ninth Circuit has

15   said they should not be used unless the facts and law clearly

16   favor the moving party.  That comes from the case of *Dahl* --

17   D-a-h-l -- *vs. HEM Pharmaceutical Corporation*, 7 F.3d 1399 at

18   1403, Ninth Circuit case from 1993.

19        Turning to the first prong of the *Winter* test, the

20   likelihood of success on the merits, I don't find that the

21   plaintiff has demonstrated -- plaintiffs, plural -- have

22   demonstrated a likelihood of success.  I am concerned that the

23   Pullman document -- doctrine would suggest I stay away from

24   this case given that these issues are being litigated right now

25   in front of the Supreme Court of Nevada.  This is an issue of

2:20-cv-2046-APG-DJA - November 6, 2020

1   significant state concern involving state laws and should be

2   interpreted by state courts, particularly Supreme Court

3   justices elected by state of Nevada citizens.

4         The Pullman abstention doctrine is narrow, and I don't

5   use that to completely step away from cases unless there are

6   significantly good reasons to do so.  There's a three-factor

7   test set forth in the case of *Porter vs. Jones*, 319 F.3d 483, a

8   Ninth Circuit case from 2003.  Those factors here suggest that

9   I should step away and allow the Supreme Court of Nevada to

10  make that decision.  I'm not going to do that.  I'm not going

11  to say I'm abstaining, but I do think I -- I do take that into

12  consideration in looking at the likelihood of success on the

13  merits in this case.

14        The defendants and DNC raise issues of standing on

15  behalf of the plaintiffs, or that the plaintiffs don't have

16  standing.  I'm not going to get into that issue today.  I'll

17  presume for purpose of today that they do have standing.

18        Turning to the statutes of Nevada, Nevada Revised

19  Statute § 293.874(1)(a) says, "The clerk or employee shall

20  check the signature used for the mail ballot against all

21  signatures of the voter available in the records of the clerk."

22  Nevada Revised Statute § 293.887(1) says that "for an affected

23  election, the county or city clerk shall establish procedures

24  for the processing and counting of mail ballots," and it goes

25  on to say that those procedures may authorize mail ballots to

———2:20-cv-2046-APG-DJA - November 6, 2020———

1    be processed and counted by electronic means.  Mr. O'Mara

2    correctly points out that the second part of that subsection

3    says that those procedures must not conflict with the

4    provisions of the other parts of the Nevada election statute.

5    That's true.  I don't find the Agilis system as used here, so

6    far, to conflict with the other provisions of the Nevada

7    election laws.

8            I don't see a likelihood of success on the merits of

9    the plaintiffs' claims.  Nor do I see a likelihood of success

10   in showing that Mr. Prudhome was denied public access to

11   observe the procedures as required under the statute, and the

12   injunction that's being requested, at least on the papers,

13   didn't quite address the harm alleged and I am loath to get

14   into the weeds of entering an injunction about distances and

15   volumes and overhearing what the reporter -- or the election

16   counters are doing and all those kind of things.  The cases are

17   legion that judges like me should try to avoid that when

18   possible.  I would do that if I thought there was a stronger

19   reason to do that here, but I don't see that.

20           Turning to the prong of irreparable harm, Ms. Stokke,

21   it appears to me, could have repaired her harm by filing a

22   provisional ballot with the affidavit.  There is also little to

23   no evidence that the Agilis machine incorrectly verified

24   Ms. Stokke's signatures in particular.  There's little to no

25   evidence that the machine is not doing what it's supposed to

2:20-cv-2046-APG-DJA - November 6, 2020

1   do, or incorrectly verifying other signatures.  There's no

2   evidence that the Agilis machine even touched her ballot, or if

3   it did, that it kicked out a different problem, nor is there

4   evidence that a human review would have done it better.  At

5   best, we have one piece of evidence, Ms. Stokke's affidavit.

6   We've got the statements, apparently, that Mr. Gloria and two

7   other supervisors actually did look at it by hand, so that's

8   the relief that the plaintiffs' counsel wants, and that was

9   given to them.

10          Turning to the balance of hardships, the plaintiffs

11  have shown that there is at best one ballot that was invalidly

12  placed.  On the other hand, we have tens, if not hundreds of

13  thousands of votes that potentially might not be counted

14  because the signatures might not be able to be verified by

15  human beings before the canvass window closes under the

16  statute.  Ms. Miller thinks that that may be doable, depending

17  upon how many are counted, but I don't have the evidence in

18  front of me to show that that could be done.  In fact, I've got

19  Mr. -- or Judge Wilson's finding that at the time back then, it

20  could not be done.  I acknowledge that Ms. Miller suggests that

21  it would not be as catastrophic this time, I factor that in to

22  the analysis of this -- of this factor.  I don't know that it's

23  determinative one way or another on that point.

24          The public interest is not in favor of disrupting the

25  completion of the processing and counting of the ballots.

1   There is an interest in having the Nevada legislature's rules

2   and laws carried out.  There is an interest in not

3   disenfranchising tens, if not hundreds of thousands of votes,

4   potentially, balanced against potentially one improper ballot.

5   So the balance of hardships and equities and the public

6   interest don't favor entering injunctive relief at this time.

7          Now let me be clear, I threw around terms like

8   "laches" earlier.  Let me be clear that I'm not deciding this

9   case on a technicality or some esoteric legal principle like

10  laches or Pullman abstention, rather I'm deciding that the

11  plaintiffs have not come to the Court at this point with a

12  sufficient legal showing and a sufficient evidentiary basis to

13  get what is required to obtain the extraordinary relief of an

14  injunction, especially a mandatory affirmative injunction that

15  would require me to dictate to the Clark County Elections Board

16  and folks over there how to do their jobs.  So, I am going to

17  deny the motion for Temporary Restraining Order.

18         With regard to the Motion for Preliminary Injunction

19  that's attached to it, at this stage, I'm going to deny that as

20  well.  If I give full credence to the two affidavits that are

21  attached to the motions, that is, the declarations I should say

22  of Mr. Prudhome and Ms. Stokke, even giving those the full

23  merit of truth, it still does not rise to the level of

24  justifying a Preliminary Injunction.  So I'm going to deny the

25  Motion for Preliminary Injunction without prejudice.  If the

─────2:20-cv-2046-APG-DJA - November 6, 2020─────

1   plaintiffs can come up with more evidence or different

2   arguments that are more compelling, but particularly more

3   evidence that would justify an Evidentiary Hearing, then I

4   would consider that on a Motion for Preliminary Injunction.

5   But at this stage, I don't see the need for an Evidentiary

6   Hearing because what's in front of me, even if I give credence

7   to those declarations, it would not cause me to issue the

8   injunction so an Evidentiary Hearing at this stage would not be

9   needed.

10          So that's my ruling.  The motions are denied.  The

11   case will go forward, as all civil cases do.

12          Anything else I can address for the parties?

13          Mr. O'Mara?

14          MR. O'MARA:  No, Your Honor.  Thank you very much,

15   again, on behalf of everybody, to your staff and everyone else

16   for setting this hearing so quickly.

17          THE COURT:  You're welcome, and I do want to thank all

18   of the parties and all of the lawyers.  This was very

19   well-briefed and it was on a compressed time frame.  I do

20   appreciate everyone's professional- -- professionalism,

21   ability, and well-briefing.

22          Mr. Newby, anything further from you or your party?

23          MR. NEWBY:  Nothing further at this time.  Have a good

24   weekend, Your Honor.

25          THE COURT:  You too.

—2:20-cv-2046-APG-DJA - November 6, 2020—

1          Ms. Miller, anything from you or your client?

2          MS. MILLER:  No, thank you, Your Honor.

3          THE COURT:  Mr. Devaney, anything further from you or

4     your client?

5          MS. MILLER:  No thanks, Your Honor.

6          THE COURT:  With that then, the hearing is concluded.

7     I hope you all stay safe, and wear your masks.

8          We're in recess on this matter.

9        (Proceedings adjourned at 4:12 p.m.)

10

11                    --oOo--

12              COURT REPORTER'S CERTIFICATE

13

14       I, Heather K. Newman, Official Court Reporter, United

15    States District Court, District of Nevada, Las Vegas, Nevada,

16    do hereby certify that pursuant to Section 753, Title 28,

17    United States Code, the foregoing is a true, complete, and

18    correct transcript of the proceedings had in connection with

19    the above-entitled matter.

20

21    DATED:  11-16-2020          _____/s/ Heather K. Newman____
                                  Heather K. Newman, CCR #774
22                                OFFICIAL FEDERAL REPORTER

23

24

25